Charles Milton MAYHEW,
Jr., Appellant

v.

Amanda Mayhew DEALEY, individually
and on behalf of the Estate of Charles
Milton Mayhew, Appellee.

No. 05–03–00007–CV.

Court of Appeals of Texas,
Dallas.

Aug. 5, 2004.

Rehearing Overruled Sept. 23, 2004.

William S. Hommel, Tyler, Stanley I. Weinberg, Peter A. Lesser, Dallas, for Appellant.

Steve Sumner, Rebecca E. Hamilton, Sumner, Schick & Hamilton, Dallas, for Appellee.

Before Justices MOSELEY, FITZGERALD, and LANG.

## OPINION

Opinion by Justice FITZGERALD.

Charles Milton Mayhew, Jr. appeals the trial court's judgment awarding his sister, Amanda Mayhew Dealey (Amanda), individually and on behalf of the estate of Charles Milton Mayhew, Sr., $26 million, plus pre- and post-judgment interest, in this wrongful death and survivorship action. Appellant brings six issues asserting: (a) the trial court erred in not granting appellant's motion for new trial based on newly discovered evidence; (b) the evidence is legally and factually insufficient to support the jury's findings that appellant's acts were the proximate cause of his father's death and that he intentionally inflicted emotional distress on his father; (c) the trial court erred in admitting tape recordings of appellant threatening his father three years before his death; (d) Amanda lacked standing to bring a survival action on behalf of the estate; and (e) the trial court erred in granting Amanda leave to amend her petition to conform to the jury's verdict. We affirm the trial court's judgment.

## FACTUAL BACKGROUND

On March 1, 1998, eighty-one-year-old Charlie Mayhew was found lying in his bed, killed by a shotgun shot to the neck. His body was discovered by his grandson, Chris Dealey. After the Dallas County Sheriff's Department had investigated the case for nearly two years without making an arrest, Amanda, believing appellant killed their father, brought suit against appellant for Charlie's wrongful death.

When Charlie retired in 1975, he had a $3 million nest egg. He also owned 852 acres in the Town of Sunnyvale in Dallas County, as well as substantial property in San Saba, Texas. Charlie's two children, appellant and Amanda, each had trusts worth about a million dollars from Charlie and his father.

In about 1983, appellant and Charlie decided to develop the family's land in Sunnyvale. Except for fifty-two acres of land including Charlie's house, the Sunnyvale property was placed in a limited partnership, Mayhew Properties, Ltd., with appellant being the general partner and the family members as limited partners. Mayhew Properties, Ltd. then became a limited partner in another limited partnership, Sunnyvale Properties, Ltd.

Key to the development plan was the ability to construct three residences per acre. However, due to an ordinance passed when Charlie was Mayor of Sunnyvale, the minimum size of lots for residential use was one acre. Sunnyvale Properties applied to have the zoning changed to permit three residences per acre and spent substantial money preparing the necessary scientific and other studies to present at the hearings in support of its application. After a series of hearings, the city council denied the partnership's zoning application. The Mayhews then sued the Town in what became a drawn-out court battle lasting more than a decade. *See Mayhew v. Town of Sunnyvale,* 774 S.W.2d 284 (Tex. App.-Dallas 1989, writ denied), *appeal after remand,* 905 S.W.2d 234 (Tex.App.-Dallas 1994), *rev'd,* 964 S.W.2d 922 (Tex. 1998). Two weeks after Charlie's murder, the supreme court issued its opinion, rendering judgment that the Mayhews take nothing on their claims against the Town. *Town of Sunnyvale,* 964 S.W.2d at 940. The expenses of the rezoning application and the decade of litigation against the

Town slowly consumed appellant's and Charlie's liquid assets as well as appellant's real estate holdings.

Appellant was subject to alcoholism, and before the litigation, he had been sober for about eight years. In the early 1990s, as the litigation dragged on, he returned to drinking. Appellant had a short temper, and his drinking made it worse. Appellant became increasingly verbally abusive, particularly toward Charlie.

In March 1995, during a fit of rage, appellant told Charlie he was quitting his position of general partner in Mayhew Properties. Appellant had said he was quitting many times before, but this time Charlie wrote appellant a letter accepting his resignation. The next month, when appellant learned of the acceptance of his resignation, appellant telephoned Charlie and verbally abused him, threatening to kill and mutilate him.

Charlie tape recorded his next three conversations with appellant, occurring on April 17, 18, and 20, 1995. Much of the recorded conversation concerns appellant's anger toward Charlie for accepting his resignation, his demanding Charlie change the limited partnership agreement to provide that appellant would receive at least one third of the amount from any sale of the property, and his frustration with Charlie for refusing to rewrite the Mayhew Properties' partnership agreement so that he would have a greater interest in the partnership than Amanda.

In these conversations, appellant verbally abused his father, and he threatened to kill and mutilate him. Appellant also told Charlie he would kill Amanda, and he used extremely vulgar language to refer to her. Appellant threatened to kill Charlie's dogs, saying, "It's time for a dog killing."[1] Appellant repeatedly threatened to commit suicide and stated it was Charlie's fault and he hoped Charlie would feel bad about it. Appellant's tone of voice varied from slow and calm to screaming, and he delivered his threats and insults in both. Vulgarity and profanity dominated appellant's vocabulary throughout these conversations. Charlie's tone of voice remained calm throughout the conversations, and he never raised his voice with appellant.

In June 1997, appellant married Phyllis Dean. Through February 1998, appellant drank beer continuously from the time he awoke until he went to bed.[2] Appellant exhibited mood swings, sometimes being "very nice to get along with. And then other times he'd just fly off the handle and get extremely upset, and he'd usually leave." Dean saw appellant treat Charlie "like dirt" and be "extremely verbally abusive" toward him. She also saw appellant shove Charlie a couple of times. Charlie never fought back. "He would usually just shrug his shoulders and try to calm [appellant] down and back off from it."

The Mayhews' insurance agent, Barbara Jo Cooley, testified that in the fall of 1996, she saw appellant hitting Charlie in the head and Charlie trying to fend off the blows. On another occasion, appellant and Charlie were arguing about money, and appellant pointed a gun at Charlie and "told him he was going to end it right there." Cooley also testified that in December 1997, appellant told her that Char-

---

1. Appellant testified the phrase, "It's time for a dog killing," does not have its literal meaning. Appellant attempted to explain this phrase as follows: "[A] dog killing is commonly referred to among country folks we're going to have a dog killing, and that's just— it's not directed to the fact that it's a dog and it's not directed to anything that's going to get killed, I mean, you know."

2. By the time of the trial, appellant had returned to sobriety.

lie had cut him off financially and that he hated Charlie. Appellant testified that none of these incidents occurred, that Charlie had not cut him off financially, and that Cooley was lying. Cooley also testified she saw appellant, while intoxicated, prepare to shoot one neighbor for riding his horse on Charlie's land, and she saw appellant fire a couple of shots at another neighbor who was fishing at Charlie's lake.

On February 26, 1998, two days before Charlie's death, Charlie was upset and worried, and he told his neighbor that appellant "was out of control and that he didn't know if he could control him."

On February 27, 1998, appellant was at Charlie's house in the afternoon, and they argued about Sunnyvale and appellant's money. Appellant wanted Charlie to put in writing what appellant's interest in Mayhew Properties would be considering appellant's years of work for the partnership, but Charlie refused to do so until they had "the final figures." Their argument ended with an agreement to meet for lunch on Sunday afternoon when appellant would grill steaks for them.

At 11:00 a.m. on February 28, Gene Brown, an old friend of Charlie's, picked up Charlie to take him to lunch, as Brown did every Saturday morning. When Charlie got in Brown's truck, Charlie was upset and "scared to death." Charlie said, "they threatened to kill me," and he waved his hand toward his neighbors' house, indicating they had threatened him. Charlie was so shook up he could not talk.

That evening, appellant talked to Charlie on the telephone at about 6:30 p.m., and they argued for about ten or fifteen minutes. Dean heard appellant's side of the conversation, and she testified that appellant was "very angry." The conversation

was such that Dean left the room, which was her habit "when it got really bad." After appellant got off the telephone, he and Dean went to the VFW club. Dean testified they left the VFW club at about 10:00 p.m.[3] When they got back to Dean's house, they had an argument, appellant became angry, and he said he was going to spend the night at Charlie's house. Appellant grabbed his pillow and shaving kit and drove away.

Appellant testified that he did not drive to Charlie's house but drove to the VFW club; when he got there, it was closed. Appellant looked at his watch and saw it was 10:50 p.m. Appellant then drove to the County Line bar, which was open. Appellant went in and sat at the bar and had a couple of beers. Appellant left the County Line bar at about 11:45 p.m. Appellant testified he had decided in the bar that he should not run to Charlie every time he and Dean had a fight, so he got in his truck and drove back to Dean's house. He testified he did not drive to Charlie's house that night. Dean testified appellant got home at about midnight, they talked until about 2:30 a.m., and they went to bed.

Pat Stiager lived on Collins Road south of the intersection of Nance Road on which Charlie lived. On February 28, 1998, between 11:30 p.m. and 12:30 a.m., he went outside and saw headlights at the end of Nance Road where Charlie's driveway is located. Stiager saw the headlights turn south and come toward him. As the vehicle went past, Stiager saw it was appellant's pickup truck. Stiager testified he could see through the windows of the pickup, and he saw that appellant was the driver and that he was alone in the pickup. Appellant's pickup was the only vehicle that drove past Stiager while he was outside that night.

---

**3.** Dean testified they left the VFW club before it closed; however, the parties stipulated that on February 28, 1998, the VFW club closed at 9:12 p.m.

Chris Dealey, who was Charlie's grandson, Amanda's son, and appellant's nephew, testified that he drove to Dallas from Austin with his girlfriend on February 28 to attend a performance of the Dallas Symphony. After the symphony, they spent the night at Amanda's apartment in Dallas. The next morning, they left the apartment at about 11:00 a.m. and drove to Chris's father's house and visited him. They then drove to Charlie's house. When they got there, they could hear a television in Charlie's bedroom. Chris went to the bedroom, looked inside, and saw Charlie lying on the bed. Chris said, "Pawpaw," and getting no response, assumed Charlie was asleep. Chris then gave his girlfriend a tour of the rest of the house and the grounds. As it was then time for them to leave to return to Austin, Chris told his girlfriend to wait in the library while he said goodbye to Charlie. Chris went in the bedroom, said "Pawpaw" louder, and shook Charlie to wake him. Chris saw a lot of blood had come out of Charlie's nose and mouth and had dried on the pillow, and he noticed that Charlie's body was cold. Chris then called appellant.

Appellant and Dean got up at about 11:00 a.m. on March 1. Appellant testified that he was about to leave to buy the steaks for his lunch with Charlie when Chris called, told him Charlie had died, and asked him to come over.

When appellant got to Charlie's house, Chris told him he thought Charlie had died of an aneurysm or a hemorrhage. As they entered the bedroom, appellant said, "Daddy. Daddy, come on Daddy, wake up. Don't do this to me." They then approached the bed, and appellant pulled down the covers a little bit, which revealed the gunshot hole in Charlie's neck. Appellant told Chris that Charlie did not die of an aneurysm or a hemorrhage but that he had been killed. They left the bedroom and went back to the library, and appellant called 911.

Mike Magee, the chief of the Sunnyvale Fire Department, and Troy Nelson, the captain of the Sunnyvale EMS, soon arrived, and appellant, with beer in hand, met them at the door. Appellant told them there was no need to hurry, and he offered each of them a beer, which they declined. Appellant led them to Charlie's body. Appellant pulled back the sheets far enough to show them the wound in Charlie's neck. Nelson and Magee instructed the dispatcher to get the sheriff's department, and they ordered everyone out of the house.

As they stood outside, appellant talked to Magee and Nelson, who testified appellant said something inconsistent with his innocence. Before his arrival at the house, appellant had been told only that Charlie had died, not that he had been killed. Yet Magee and Nelson testified appellant told them that during the drive to the house, he did not think about the incident until he got to Nance Road, and then he asked himself how someone could have done this to Charlie.[4] This statement was not two

4. Magee described appellant's statement: "[Appellant] made mention that he hadn't thought a whole lot about the incident until he turned onto Nance Road, and then he made a comment as to how someone could do that to his father." During cross-examination, appellant's attorney read from Magee's affidavit he gave to the sheriff's department describing appellant's statement: "It did not bother him much about the death until he turned onto Nance Road.... And then he said, I don't understand how someone could do something like this." On redirect examination, Magee read from his affidavit: "After a little while, [appellant] came back over to us and started talking. As he drove from Forney, it did not bother him about the death until he turned onto Nance Road and then it said he didn't—I didn't understand how someone could do something like this."

discrete statements but was "all just in a— in a flow of conversation." Appellant testified that Magee and Nelson misinterpreted his statement. Appellant said the statement was three different thoughts: (1) in the first part of the drive, appellant had no feeling; (2) when he turned onto Nance Road, where he had learned to ride a bicycle and to drive and where he so often would see Charlie, he became emotional; and (3) while he was speaking to Magee and Nelson, when they all knew Charlie had been murdered, he wondered how someone could have killed his father.

When the detectives arrived later in the afternoon, they found Charlie lying on his back with the covers pulled tight to a crease as if someone had tucked them in. The shotgun blast had passed through the covers before striking Charlie, and the bedclothes probably prevented any spattering. When the bedclothes were removed, the detectives discovered that Charlie was naked, a rag covered his genitals, and his left hand lay on top of the rag with his fingers slightly curled around it. A pillow was between his knees. Charlie's right hand lay across the upper part of his chest with the palm facing away. The gunshot was in the left side of his neck just below his ear. During the autopsy,

pellets of size 7½ shot was recovered as well as a plastic shot cup consistent with Remington 12–gauge ammunition. Detective Howard Sparks testified that, based on the position of Charlie's body, Charlie was asleep when he was killed.

Dr. Joseph Guileyardo, a forensic pathologist, testified that the position of Charlie's hands indicates it is more likely than not that Charlie was awake when he was shot. The rag over Charlie's genitals indicates Charlie was concerned about his incontinence,[5] but it is unlikely his left hand would have remained on top of the rag if he had fallen asleep. Dr. Guileyardo also stated the position of Charlie's right hand being raised near the wound and facing out toward where the gun would have been was consistent with his assuming a defensive posture at the time he was shot. Dr. Guileyardo also said, "there's a good chance he [Charlie] was not the one that pulled the covers up to that position." However, Dr. Guileyardo agreed the evidence was also consistent with Charlie's having been asleep when he was shot.

Dr. Guileyardo also testified that rigor mortis was fully developed when Charlie was pronounced dead at 4:40 p.m. on March 1, 1998, indicating the time of Char-

On direct examination, Nelson was asked if appellant made "any statements to you about his beliefs when he first turned down Nance Road on his way to his father's house that morning." Nelson answered, "The comment to myself or that I was overheard [sic] as he was talking to us was that he could believe that he could—or he could handle it if it had been a bad—it had been a heart attack or something, but he couldn't handle it because it was something terrible." Nelson then read from the affidavit he gave the sheriff's department: "He also talked about the call and how on the drive over, he was doing fine until he turned on Nance Road at which he became emotional thinking of what had happened to Charles. He mentioned that he could have handled it if it had been a heart attack but not this horrible thing. He said it was bad. It

was a real bad thing." On cross-examination, Nelson was asked if it were possible "that [appellant] was making two separate statement; and one being related to driving down Nance Road and realizing that his father had died, and the other being the realization or being upset at the manner in which his father had been killed." Nelson answered, "When he—when he initially made our—the statement to us, it was in regard to being all in one—one comment of how he did fine until he turned on Nance Road. He said he did fine coming in until he turned on Nance Road and realized how bad the situation—how—how horrible it was."

5. Charlie was incontinent as a result of prostate surgery, and he wore adult diapers.

lie's death was between twelve and thirty-six hours before the pronouncement of death. Thus, Charlie's death occurred between 4:40 a.m. on February 28 and 4:40 a.m. on March 1, 1998.

The detectives searched the house with appellant and concluded nothing was stolen. Inside a gun cabinet were many guns, and except for one gun, they were all clean. The exception was a Browning over-and-under 12–gauge shotgun, the bottom barrel of which smelled of burnt powder, indicating this gun had been fired recently, possibly in the last two or three days. No spent shell was found in this gun or in the bedroom. The gun was examined for fingerprints, and one comparable print was found in the groove of the fore-end of the stock. The detectives compared this print to Charlie's and appellant's fingerprints, and they concluded it did not match their prints. The lifted print was placed in the Automatic Fingerprint Identification System, but no match was made. At trial, the detectives testified they did not know whose print was on the gun, and Lieutenant Paul Walker testified that the print could have been on the gun for months. A small amount of a substance that tested positive for presumptively being blood was found on the barrel of the gun. Walker testified he could not say it was more likely than not that the gun was the murder weapon or that the ammunition used to kill Charlie came from the house. Detective Howard Sparks testified that any 12–gauge shotgun could have been the murder weapon.

Many witnesses testified to appellant's self-professed violence. He told witnesses he had killed people while he was with soldiers in Africa. He bragged that he was contract killer and a hit man, and that he had received $40,000 for killing someone. Appellant admitted telling people these things, but he testified they were not true. Appellant also told several people he once had entered Charlie's house while Charlie was asleep, turned on all the lights, put a gun to Charlie's head without awakening him, and that he could have killed him. Appellant testified he told people this because he wanted them to help him convince Charlie to lock the doors of the house and to keep the gate chained (Charlie refused to lock any of the eleven exterior doors of the house), but he said he did not actually put a gun to Charlie's head.

Dr. Richard Coons, a psychiatrist and expert on the effects of alcohol, drug, and brain injuries on behavior, testified to appellant's diminished level of violent impulse control at the time of Charlie's murder. Alcohol reduces impulse control, and appellant had been drinking all day. Appellant suffered from alcoholic liver disease, which reduced his body's ability to metabolize alcohol, resulting in his having more alcohol flowing through his system for a longer period than a person with a healthy liver. Appellant was also taking the drug butalbital, which reduced his impulse control. Appellant had cerebral cortical atrophy, which reduced his impulse control. Appellant also had bipolar disorder and suffered from the personality disorders of narcissism and paranoia, all of which would have reduced his impulse control. Dr. Coons also testified that a person with a history of violent thoughts and a person who has been in arguments all day may have reduced impulse control. A person with all of these problems would be "a dangerous situation and—and something should be done." Dr. Coons testified he could not state that appellant killed Charlie.

Charlie kept his important papers in his briefcase, which he kept in the library. When the briefcase was searched, Charlie's will and a change-of-life-insurance-

beneficiary form were missing.[6] Some time later, a large envelope was found in Charlie's car that had not been in there when the car was searched on March 1, 1998. Inside the envelope was Charlie's 1997 will and a letter from Amanda to Charlie about the will. Appellant testified that before the reading of the will, he was unaware that Charlie had changed his will, and he denied putting the envelope in Charlie's car. The change-of-life-insurance-beneficiary form was never found.

The jury found: (1) appellant caused Charlie's death; (2) appellant intentionally inflicted severe emotional distress on Charlie on or between February 26, 1998 and March 1, 1998; (3) $5 million would fairly and reasonably compensate Charlie's estate for his pain and mental anguish; (4) $9 million would fairly and reasonably compensate Amanda for her damages from appellant's having caused Charlie's death; (5) clear and convincing evidence established that the harm to Charlie resulted from malice; and (6) $12 million in exemplary damages should be awarded to Charlie's estate.

## MOTION FOR NEW TRIAL

In his first issue, appellant asserts the trial court erred by not granting his motion for new trial based on newly discovered evidence.[7] Appellant's trial took place on March 26 through April 19, 2002. At trial, the police testified they found one of the 12-gauge shotguns in the house had

been "very recently" fired. In a report signed on March 2, 1998, the day after Charlie's murder, Lieutenant Paul Walker with the physical evidence section of the Dallas County Sheriff's Department stated the shotgun was examined for fingerprints and "several latent prints were developed and collected for comparison" and compared to appellant's and Charlie's fingerprints and determined they did not match the prints. Lieutenant James Howell with the physical evidence section of the Dallas County Sheriff's Department testified during the trial that the lifted print was compared to the fingerprints of only two people, appellant and Charlie. On August 7, 2002, after the conclusion of the jury trial but before the trial court signed the judgment, the police compared the print to Chris's fingerprints and determined the print on the gun matched his fingerprints. The trial court signed the final judgment on September 30, 2002. Appellant then filed a motion for new trial asserting the match of the fingerprint found on the gun to Chris is newly discovered evidence entitling appellant to a new trial.

 A party seeking a new trial on the ground of newly discovered evidence must show the trial court that: (1) the evidence has come to his knowledge since the trial; (2) it was not owing to the want of due diligence that it did not come sooner; (3) it is not cumulative; and (4) it is so material that it would probably produce a

---

6. In December 1997, Charlie rewrote his will. Under the old will, appellant and Amanda would each receive half of Charlie's residuary estate, except appellant would receive one million dollars more than Amanda. Under the new will, appellant would receive no more than forty percent of Charlie's estate, and Amanda and Chris would receive no less than sixty percent of Charlie's estate. Charlie had filled out a form changing the beneficiary on his life insurance policy from appellant to Chris; however, after Charlie's death, this

form was never found. Appellant testified that Charlie did not tell him of the changes to his will and life insurance.

7. Appellant's motion for new trial was overruled by operation of law on December 14, 2002. *See* Tex.R. Civ. P. 329b(c). On January 23, 2003, the trial court signed an order purporting to deny appellant's motion for new trial, but the trial court's plenary power had already expired. *See* Tex.R. Civ. P. 329b(e).

different result if a new trial were granted. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex.1983), *overruled on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003); *Dallas Indep. Sch. Dist. v. Finlan*, 27 S.W.3d 220, 240 (Tex.App.-Dallas 2000, pet. denied). Whether a motion for new trial on the ground of newly discovered evidence will be granted or refused is generally a matter addressed to the sound discretion of the trial court, and the trial court's action will not be disturbed on appeal absent an abuse of such discretion. *Jackson*, 660 S.W.2d at 809. In passing on a motion for new trial on the ground of newly discovered evidence, the court will take into consideration the weight and the importance of the new evidence and its bearing in connection with the evidence received at trial. *Jackson*, 660 S.W.2d at 809.

Appellant's trial took place during March and April 2002. In August 2002, the sheriff's department, for the first time, compared the latent print lifted from the over-and-under shotgun to Chris's fingerprints and confirmed that the latent print was left by Chris. No evidence at trial even suggested the possibility that Chris may have touched the gun. Thus, appellant established that the evidence came to his knowledge after trial and that the evidence is not cumulative.

■ We must consider whether appellant's lack of due diligence is responsible for the failure to discover the evidence sooner and whether it is so material that it would probably produce a different result if a new trial were granted. The evidence at the trial showed the police, by March 2, 1998, had compared the fingerprint found on the gun to appellant and Mayhew and that it did not match them. Appellant's attorney testified he learned of this evidence in May 2001. From this evidence, appellant could surmise the police did not compare the print to anyone else, including Chris. Testimony at the hearing on the motion for new trial showed appellant could have subpoenaed a copy of the fingerprint from the police to compare to whomever he wanted, but he did not do so. The evidence also showed appellant could have sought an order to be allowed to have an expert examine the original fingerprint at the sheriff's department to compare to prints of other persons, including Chris, but appellant did not do so. Appellant had more than two years between the filing of the lawsuit on February 28, 2000 and the trial in March and April 2002 to investigate who left the prints on the gun, but he took no steps to do so. Chris, as the person who found Charlie's body, and as an heir to his estate, was a logical person to test for a match to the print found on the gun.

Appellant's trial counsel testified that he assumed the sheriff's department had compared the comparable latent prints to everyone who had been at the crime scene on March 1, 1998 because a competent criminal investigation would have included such a comparison. The sheriff's department's investigators agreed that a competent investigation would have included a comparison to those of everyone at the crime scene, but they had no reason to suspect Chris of the offense.

The sheriff's department's lack of diligence in pursuing fingerprint evidence is also shown by Defendant's Exhibit 31J, the report of latent prints lifted from beer bottles found at the scene. On March 28, 1998, the detective with the physical evidence section filed a report stating that comparable latent prints were lifted from one of bottles and "were photographed for later comparison," which showed that the sheriff's department had not compared these prints to anyone.

Appellant does not explain in his brief how the sheriff's department's lack of diligence excuses him from diligently investigating the case. As discussed above, the evidence reports from the physical evidence section of the sheriff's department show whose prints were compared and that only the prints of appellant and Charlie were compared. Appellant had copies of these reports. Both the lifted print from the gun and Chris were available for comparison. This evidence shows appellant has not met the second prong, that the failure to discover the evidence before trial is not due to the defendant's lack of due diligence.

■ We also conclude appellant has not met the fourth prong, that the newly discovered evidence is so material that it would probably produce a different result if a new trial were granted. In this case, the uncontroverted evidence before the jury established that appellant's fingerprint was not on the gun and that the print of someone other than appellant and Charlie was on the gun. However, the jury found appellant killed Charlie. The evidence does not show the gun was the murder weapon or when the print was left on the gun. Thus, the trial court could reasonably conclude that whether the fingerprint on the gun was left by an unknown person or by Chris would not probably produce a different result if a new trial were granted.

We hold appellant has failed to show the trial court abused its discretion by not granting the motion for new trial. We resolve appellant's first issue against him.

## SUFFICIENCY OF THE EVIDENCE

In his second and third issues, appellant contends the evidence is legally and factually insufficient to support the jury's verdict.

## Standard of Review

In addressing a legal sufficiency or no-evidence challenge, we must consider only the evidence and inferences, viewed in their most favorable light, that support the jury's finding, and we must disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). If there is more than a scintilla of evidence to support the finding, then the no-evidence challenge fails. *BMC Software Belgium, N.V. v. Marchand,* 83 S.W.3d 789, 795 (Tex.2002); *Stafford,* 726 S.W.2d at 16. When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Lozano v. Lozano,* 52 S.W.3d 141, 145 (Tex.2001); *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983). However, if the evidence supplies some reasonable basis for differing conclusions by reasonable minds as to the existence of a vital fact, then there is some evidence. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 519 (Tex.2002); *Kindred,* 650 S.W.2d at 63.

In addressing a factual sufficiency of the evidence challenge upon a jury verdict, an appellate court must consider and weigh *all* the evidence, not just that evidence which supports the verdict. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex. 2001); *City of Princeton v. Abbott,* 792 S.W.2d 161, 163 (Tex.App.-Dallas 1990, writ denied). The verdict should be set aside only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Dow Chem. Co.,* 46 S.W.3d at 242; *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). However, this Court is not a fact finder, and we may not pass upon the credibility of the witnesses or substitute our judgment for that of the

trier of fact, even if a different answer could be reached upon review of the evidence. *Durban v. Guajardo*, 79 S.W.3d 198, 208 (Tex.App.-Dallas 2002, no pet.); *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex.App.-Dallas 1986, writ ref'd n.r.e.).

## Wrongful Death

In his second issue, appellant asserts the evidence is legally and factually insufficient for the jury to find an act by appellant proximately caused Charlie's death. As appellant observes, there is no physical evidence linking appellant to the shooting. Likewise, no witness testified to seeing appellant shoot his father. Accordingly, we determine whether there is sufficient circumstantial evidence to support the verdict.

■ The record shows that appellant was subject to bouts of extreme rage, particularly when dealing with his father. Appellant had for years threatened to kill and mutilate his father, and he had an argument with Charlie the night of his death. Appellant had told people he once had put a gun to Charlie's head when he was sleeping and could have killed him. Appellant was particularly susceptible to lack of violent impulse control due to his heavy drinking and use of the drug butalbital, his bipolar disorder, his narcissism and paranoia, and his cerebral cortical atrophy. Appellant had shot at other people when he was intoxicated. Although appellant denied ever assaulting his father, other witnesses testified to having seen appellant shove, shake, and hit him. Although appellant denied being at Charlie's house on February 28 or on March 1 before Chris called him with the news of Charlie's death, Pat Stiager saw appellant driving away from the house on the night of February 28 between 11:30 p.m. and 12:30 a.m. This time was consistent with the estimated time of death. Although the

detectives, with appellant's assistance, determined nothing was taken from the house, the record shows Charlie's will and his change-of-life-insurance-beneficiary form were missing from his briefcase. Both of these documents affected appellant negatively. Although the will mysteriously reappeared later in Charlie's car, the change-of-life-insurance-beneficiary form was never recovered. Finally, there is appellant's statement to Nelson and Magee that, as he drove to Charlie's house, he asked himself who could have done such a thing, when he had no reason to think Charlie's death at age 81 was not due to natural causes. Although all the evidence is circumstantial, we conclude there is both legally and factually sufficient evidence to support the jury's verdict that appellant caused Charlie's death.

■ Appellant also makes the following argument: "In addition, Appellant also claims that the damage award made by the jury was excessive. An excessive damage award claim is reviewed under the same standard as that applied to any factual insufficiency claim. *Haryanto v. Saeed*, 860 S.W.2d 913, 921 (Tex.App.-Houston [14th Dist.] 1993, writ denied)." That is appellant's entire argument on this claim. Rule of appellate procedure 38.1 requires that an appellant's brief contain "a clear and concise argument for the contention made, with appropriate citations to authorities and to the record." TEX.R.APP. P. 38.1(h). Appellant presents no argument explaining why the damages are excessive, and he cites no authority showing "the damage award made by the jury was excessive." Appellant's brief does not even identify which of the damage awards is allegedly excessive. Accordingly, any error is waived for inadequate briefing. *See* TEX.R.APP. P. 38.1(h); *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284 (Tex.1994); *In re Canales,*

113 S.W.3d 56, 72 (Tex.Rev.Trib.2003). We resolve appellant's second issue against him.

## Intentional Infliction of Emotional Distress

■ In his third issue, appellant asserts the evidence is legally and factually insufficient to support the jury's finding that he intentionally inflicted emotional distress on Charlie between February 26 and March 1, 1998. The narrow time period was due to limitations; Amanda filed suit on February 25, 2000.

■ The elements of intentional infliction of emotional distress are: (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was extreme or outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the resulting emotional distress was severe. *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex.2003). Conduct is "extreme and outrageous" when the conduct is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (quoting *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993) (quoting RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965))).

Appellant argues there is no evidence of extreme and outrageous conduct by him toward Charlie between February 26, 1998 and March 1, 1998. The record contains evidence of a conversation appellant had with Charlie on February 28 on the telephone. According to Dean, appellant was "very angry" at Charlie and that appellant's manner of speaking to Charlie on February 28 was so extreme that she had to leave the room. The jury could infer from Dean's testimony that appellant's manner was similar to that on the audio tapes of the 1995 telephone conversations.

Even without the threats to kill, which Dean testified she never heard appellant utter, the jurors could conclude that appellant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency.

■ Furthermore, the record contains evidence of appellant's intentional infliction of emotional distress on Charlie before he killed him. Appellant testified that when Charlie went to bed, if he did not wear pajamas, he would wear adult diapers because of his incontinence. Yet contrary to his usual practice, Charlie's body was naked, and he was holding a rag over his genitals even though there were many unused diapers in the bedroom. The jury could conclude that Charlie would not have voluntarily gone to bed in that manner but was forced to do so by his killer. Dr. Guileyardo testified that it was more likely than not that Charlie was awake when he was shot. Charlie's right hand was probably raised in a defensive posture. The gun was held level when it was fired from about two to three feet from the resulting wound. This evidence shows the gunman, determined by the jury to have been appellant, forced Charlie into bed, pulled the sheets taut, and held the muzzle of the shotgun only two to three feet from Charlie's face before firing. This terrifying sequence of events most certainly was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Tiller*, 121 S.W.3d at 713. We conclude the evidence is both legally and factually sufficient to support the jury's finding that appellant intentionally inflicted emotional distress on Charlie. We resolve appellant's third issue against him.

## ADMISSION OF THE AUDIO TAPES

In his fourth issue, appellant asserts the trial court erred in admitting the taped telephone conversations from April 1995 because their probative value was greatly outweighed by the danger of unfair prejudice. *See* Tex.R. Evid. 403. In making this determination, the trial court balances the probative value of the evidence against its potential for unfair prejudice or confusion. *LSR Joint Venture No. 2 v. Callewart,* 837 S.W.2d 693, 698 (Tex.App.-Dallas 1992, writ denied). We review a trial court's decision to admit evidence for abuse of discretion. *In re J.W.,* 113 S.W.3d 605, 612 (Tex.App.-Dallas 2003, pet. denied).

Appellant asserts the trial court did not perform the balancing test. However, we may presume the trial court performed the balancing test, which need not be announced for the record. *Horizon/CMS Healthcare Corp. v. Auld,* 985 S.W.2d 216, 226 (Tex.App.-Fort Worth 1999), *aff'd in part and rev'd in part on other grounds,* 34 S.W.3d 887 (Tex.2000). Furthermore, the record reflects the trial court conducted the balancing test. The trial court, referring to appellant's objections to the tapes, stated, "Off the record earlier in the pretrial, I gave some long discussions as to why I was overruling the objections." Later, when appellant reasserted his rule 403 objection on the ground that the tapes were cumulative after appellant had testified admitting to the statements on the tapes, the trial court stated, "I realize what you're trying to do, and I agree that theoretically it could be cumulative if somebody admits—if I admit I said it, then why play the tape. But I think the tone of voice and a bunch of other things in this type of evidence are necessary." We conclude appellant has not shown the trial court did not conduct the balancing test.

Much of the testimony in this case concerned appellant's volatile temper and his abusive treatment of Charlie. The jury heard witnesses describe appellant's manner of speaking to Charlie and the change in appellant's tone of voice when he became angry. The audio tapes provided examples of appellant verbally abusing Charlie and allowed the jurors to decide for themselves whether the witnesses descriptions of appellant's behavior were accurate. Although the taped conversations took place about three years before Charlie's murder, the main subject "discussed" on the tapes, Charlie's refusal to guarantee appellant a one-third interest in the partnership's property regardless of the property's value and appellant's entitlement to it under the partnership agreement, was a point of contention between them and a subject of appellant's verbal abuse of Charlie up to Charlie's death.

We conclude the trial court did not abuse its discretion in determining the probative value of the tapes was not greatly outweighed by the danger of unfair prejudice. We resolve appellant's fourth issue against him.

## STANDING

In his fifth issue, appellant asserts Amanda had no standing to bring a survival action on behalf of Charlie's estate. Davis, not Amanda, was the executor of Charlie's estate. Ordinarily, only the executor or administrator may bring suit to recover property belonging to the estate, such as in a survival action. *Shepherd v. Ledford,* 962 S.W.2d 28, 31 (Tex. 1998); *Frazier v. Wynn,* 472 S.W.2d 750, 752 (Tex.1971); *Chandler v. Welborn,* 156 Tex. 312, 318, 294 S.W.2d 801, 806 (1956); *Burns v. Burns,* 2 S.W.3d 339, 342 (Tex. App.-San Antonio 1999, no pet.). There are exceptions to this general rule. The first exception is that heirs at law may

bring a survival action on behalf of the estate when no administration is pending and none is necessary. *Shepherd,* 962 S.W.2d at 31; *Frazier,* 472 S.W.2d at 752. The exception does not apply in this case because Charlie's estate was still being administered when suit was brought.

■ The second exception provides that heirs may bring suit when the personal representative cannot, or will not, bring the suit or when the personal representative's interests are antagonistic to those of the estate. *Chandler,* 156 Tex. at 318, 294 S.W.2d at 806; *Burns,* 2 S.W.3d at 342. Davis testified, and filed an affidavit stating, that he would not bring a lawsuit in connection with the claims asserted by Amanda on behalf of the estate. Appellant does not explain in his brief why this exception does not apply.

Because the record shows Davis, the executor of the Estate of Charles Mayhew, would not bring suit, we conclude Amanda had standing to bring the survival action on behalf of the estate. We resolve appellant's fifth issue against him.

### MOTION FOR LEAVE TO AMEND PETITION

■ In his sixth issue, appellant asserts the trial court erred in granting Amanda's motion for leave to amend her petition to conform to the jury's verdict after the trial court rendered judgment. The trial court granted Amanda's motion for leave to amend her petition the same day it rendered judgment. Appellant relies on *Boarder to Boarder Trucking, Inc. v. Mondi, Inc.,* 831 S.W.2d 495 (Tex.App.-Corpus Christi 1992, no writ). In that case, the plaintiff filed its motion for leave to amend its petition thirty-nine days after the trial court rendered judgment, and the trial court granted the motion. *Id.* at 498 (motion for new trial had been filed, so trial court retained plenary jurisdiction

thirty-nine days after judgment). The court of appeals recognized that trial courts have discretion to allow amendments to pleadings but concluded, consistent with a court of civil appeals case from 1935, that pleadings cannot be amended after judgment has been rendered. *Id.* (citing *Warren v. Ward Oil Corp.,* 87 S.W.2d 501, 502–03 (Tex.Civ.App.-Texarkana 1935, writ dism'd)).

In this case, Amanda filed her motion for leave to amend her petition on June 3, 2002. The trial court granted the motion on September 30, 2002 and, that same day, rendered judgment consistent with the amended petition. The record does not show the trial court granted leave to file the petition after rendition of judgment. We resolve appellant's sixth issue against him.

We affirm the trial court's judgment.