**Affirmed and Opinion filed January 28, 2014.**



In The

# Fourteenth Court of Appeals

NO. 14-11-00661-CV
NO. 14-11-00662-CV

**ASHISH AND APARNA KAMAT, Appellants/Cross-Appellees**

**V.**

**ASHMITA UNNI PRAKASH, Appellee/Cross-Appellant**

On Appeal from the 215th District Court
Harris County, Texas
Trial Court Cause No. 2009-28312

## O P I N I O N

For seven years, Ashmita "Stella" Unni Prakash worked as a live-in nanny in the home of Drs. Ashish and Aparna Kamat and was paid less than the federal minimum wage. Prakash sued the Kamats under the Fair Labor Standards Act ("the FLSA"). The jury found that the Kamats were equitably estopped from relying on the statute of limitations and assessed damages for the entire seven years

of Prakash's employment. The Kamats challenge the award of all damages for conduct that occurred more than two years before Prakash filed suit. In addition, they contend that the judgment violates the one-satisfaction rule and constitutes a double recovery. In a cross-appeal, Prakash challenges the trial court's failure to award her attorney's fees.

We conclude that the jury's findings in response to the charge's equitable-estoppel and damage questions support the challenged portion of the judgment. We further hold that although Prakash did not waive the right to recover damages for violations that occurred more than two years before she filed suit, she did waive the right to recover attorney's fees. We accordingly affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL HISTORY

The parties agree that Prakash worked in the Kamat household from January 21, 2001 through January 31, 2008 and that the Kamats' family members in India paid Prakash's husband varying amounts for her services. Prakash and the Kamats offered conflicting evidence about the terms of their agreement, her hours and working conditions, the amount Prakash's husband received, the extent to which any wages due to Prakash should be offset by credit for meals and lodging, and the extent of each side's actual or constructive knowledge about Prakash's wage rights.

## A.     The Beginning of Prakash's Employment

In 2000, Prakash was supporting herself, her husband, and her seven-year-old son by working as a nurse's aide in Dr. Vendana Walvekar's clinic in India. Prakash had never attended school and could neither read nor write. According to the testimony at trial, she earned monthly wages of between 1,200 and 3,000

2

rupees—an amount that, using the average conversion rate agreed upon the parties' experts at trial, was the equivalent of $26–$65.[1]

Through Walvekar, Prakash learned of an opportunity to earn more money. Walvekar's daughter, Dr. Aparna Kamat, lived in Morgantown, West Virginia with her husband, Dr. Ashish Kamat. The Kamats were expecting a baby, and Walvekar wanted them to have live-in help. She volunteered to pay the employee's wages.

Prakash had worked as a nanny before and was interested in the job. To enable her to obtain a visa to travel to the United States, Walvekar and the Kamats provided a number of documents. In her affidavit to the U.S. Consulate, Walvekar swore that she would pay Prakash a salary equivalent to $100 per week, and she represented that this amount was "the normal weekly daycare charges in the State of West Virginia, Morgantown." Ashish completed a form in which he informed the consulate that if Prakash were allowed to come to the United States, he would be responsible for her room, board, and medical expenses.

In contrast to the statements in her affidavit, Walvekar never paid Prakash her wages directly and never paid her the equivalent of $100 per week. Instead, Walvekar paid Prakash's husband a lesser amount in rupees in India. After six months, Prakash's wages continued to be paid to her husband, but were paid by Ashish's parents.

## B. The Length of Prakash's Employment Contract and Stay in the U.S.

The parties dispute the reason for Prakash's long stay in the United States.

---

[1] Prakash testified that she earned 3,000 rupees; Walvekar testified that she was paid 1,200 to 1,400 rupees. The parties agreed that under the average currency-conversion rate during Prakash's employment, one dollar was worth about forty-six rupees. We have used the same conversion rate throughout this opinion.

Prakash attested that the original agreement called for her to work just six months, and that Ashish said he would pay her an additional $1,500 at the end of that time. Although the Kamats failed to make this lump-sum payment, Prakash stated that she initially agreed to stay until the Kamats replaced her. According to Prakash, she continued to work for them, even moving with the Kamats to Houston, because they said they would bring her husband and son to the United States. Moreover, she testified that when she asked to return to India, the Kamats refused to allow her to do so. She stated that she could not return on her own because she had no money and Ashish kept her passport.

Prakash's employment ended after she happened to meet a relative of her former employer Jotika Ramchandani. Prakash met with Ramchandani on December 30, 2007 and related her version of events, and Ramchandani called Daya, an organization that assists Indian victims of domestic violence. Daya put Ramchandani in touch with Constance Rossiter, the program director of the human trafficking program at YMCA International Services. Prakash's situation was investigated by law enforcement, and on February 1, 2008, agents from the Federal Bureau of Investigation and U.S. Immigration and Customs Enforcement removed Prakash from the Kamats' home.

The Kamats contend that Prakash stayed in the United States so long because she did not want to return to India, and they maintain that Prakash fabricated most of her complaints in an attempt to remain in this country. They deny that they ever said they would bring Prakash's family here or that she lacked access to her passport.

## C.    Prakash's Wages and Offsets

Prakash's wages were increased several times, but the timing and amount of the increases are disputed. According to the Kamats, Prakash's husband was paid

4

10,000 rupees per month (about $217) during the first half of 2001; 15,000 rupees per month (about $326) in the second half of that year; 18,000 rupees per month (about $391) from 2002 through 2004; 20,000 rupees per month (about $435) in 2005 and 2006; and 25,000 rupees per month (about $543) beginning in 2007. In addition, witnesses for the Kamats testified that Prakash's husband was paid a lump-sum payment of 100,000 rupees (about $2,174) in 2002 and 400,000 rupees (about $8,696) in 2007. Witnesses for the Kamats also testified that all of these arrangements were made at Prakash's suggestion or with her consent.

In contrast, Prakash testified that her husband was paid 10,000 rupees per month (about $217) in 2001; 13,000 rupees per month (about $283) in 2002; 15,000 rupees per month (about $326) in 2003; and 18,000 rupees per month (about $391) thereafter. She denied that any lump-sum payments were made. She also testified that she did not agree that her husband should be paid instead of her; that her wages would be paid in rupees instead of dollars; or that she should be paid so little.

D.    Prakash's Working and Living Conditions

Perhaps the greatest disparity in the evidence is found in the witnesses' descriptions of Prakash's working and living conditions. According to Prakash, she worked eighteen hours a day, seven days a week, for seven years, and was never given a vacation. She described her duties to include cooking, cleaning, vacuuming, working in the yard, doing the family's laundry and ironing, washing windows, and caring for the children. She stated that she never had a room or even a bed, but slept in a sleeping bag on the floor in the Kamats' son's room. She testified that she was afraid of Ashish because she had seen him strike and choke his wife before. She also described an incident in which he yelled at her and broke her glasses because she laundered one of his shirts improperly.

5

In contrast to Prakash's testimony, both of the Kamats testified that Prakash worked only five days a week. Ashish testified that she worked an average of five or six hours a day, while Aparna testified that Prakash worked six to eight hours a day. They testified that her duties were to look after the children when the Kamats were at work; to do the children's laundry twice a week; to tidy up after the children; and to cook on Tuesdays, Wednesdays, and Thursdays. They both testified that Ashish never struck Aparna; that Prakash did not do heavy cleaning, yard work, or any laundry or ironing except for the children's clothes; that no one yelled at her; that Ashish did not break her glasses; and that although her passport was usually kept in Ashish's desk drawer or in a portable safe, Prakash had access to it at all times. They testified that Prakash always had a bed and slept in a sleeping bag in one of the children's rooms only when she chose to do so because of back pain.

### E.    Prakash's Wage Rights

It is undisputed that the Kamats never informed Prakash about her wage rights under federal law. All of the Kamats' other household employees—a housekeeper, a driver, a yard worker, and the two child-care workers they successively employed after Prakash—were paid amounts that exceeded the minimum wage. Aparna testified that until this lawsuit was filed, she never calculated the number of hours that Prakash worked or thought about the minimum wage. She stated that if she had known that the minimum-wage law applied, she would not have had Prakash come to live with them. Even after the Kamats' expert conceded at trial that the federal minimum-wage law applies in this case and identified the minimum wage applicable at different times during Prakash's employment, Ashish continued to deny that it applied to Prakash because, according to the Kamats, Prakash was Aparna's mother's employee.

**F.     The Jury Charge and Judgment**

Ultimately, the Kamats did not object to jury instructions explaining that "this case arises under the Fair Labor Standards Act, a federal law that provides for the payment of minimum wages." They also did not object to instructions that "U.S. minimum wage laws (not Indian laws) apply." The charge instructions identified the minimum-wage rate for each period of Prakash's employment and included an explanation of credits for meals and lodging.

To determine whether Prakash was entitled to recover any damages from the Kamats for their alleged violations of the FLSA, the jury had to resolve disputed fact questions about the hours she worked, the amount that her husband was paid for her services, and the extent to which the Kamats were entitled to any credits for meals and lodging they provided. In addition, the parties disagreed about the applicable limitations period, and this determination also involved questions of fact for the jury.

In the usual case, a cause of action for unpaid minimum wages is subject to a two-year statute of limitations. *See* Fair Labor Standards Act of 1938, 29 U.S.C. § 255(a) (2012). If the cause of action arises out of a willful violation of the minimum-wage law, the limitations period is three years. *Id.* The Kamats maintained that the two-year limitations period applied. Prakash alleged both that the Kamats' violations of the FLSA were willful so that the three-year limitations period applied, and that the doctrine of equitable estoppel prevented them from relying on any statutory limitations period. To address each of these scenarios, Prakash's FLSA claims were submitted to the jury in three sets of questions.[2]

---

[2] In answer to the remaining questions in the charge, the jury failed to find that Prakash was entitled to damages under a theory of quantum meruit or that Ashish or Aparna intentionally inflicted severe emotional distress on Prakash.

7

The Kamats do not challenge the portion of the judgment that is based on the jury's answer to the first set of questions, which addressed liability and damages for FLSA violations within the two-year limitations period. In answer to Question 1A, the jury found that the Kamats violated the FLSA by failing to pay Prakash the minimum wage during the time period of May 5, 2007 (the date that was two years before she filed suit) through January 31, 2008 (the last day of her employment). In answer to Question 1B, jurors found that the sum of $11,051 would fairly and reasonably compensate Prakash for those violations.

In the second set of questions, the jury found that the Kamats' actions in violating the FLSA were willful. Jurors were instructed to measure the damages for such willful violations as the difference between what Prakash should have been paid under the FLSA and what she was actually paid, less any applicable credits for meals and lodging, during the period of May 5, 2006 through May 5, 2007—a period of time that is actually one year and one day. The jury found these damages to be $14,488.

In the third set of questions, the jury found that the doctrine of equitable estoppel prevented the application of the statute of limitations to Prakash's FLSA claims. Jurors were instructed to measure damages as the difference between what Prakash should have been paid under the FLSA and what she was actually paid, less any applicable credits for meals and lodging, during the period of January 21, 2001 (the first day of her employment) and May 5, 2007 (the date that was two years before she filed suit). The jury found these damages to be $95,220.

The trial court awarded Prakash $106,271 in FLSA damages. This is the sum of the jury's damages findings in response to Question 1B (measured from May 5, 2007 through January 31, 2008) and Question 3B (measured from January 21, 2001 through May 5, 2007). The result is that Prakash was awarded damages

for the entire length of her employment, and the single day of May 5, 2007 was included twice. Pursuant to a federal statute, the trial court also awarded Prakash a further $106,271 in liquidated damages. *See* 29 U.S.C. § 216 (2012).[3] Finally, the trial court awarded post-judgment interest and taxed costs against the Kamats. Both sides appealed.

## II. ISSUES PRESENTED

The Kamats present five issues for review. In their first issue, they contend that Prakash waived her right to recover damages for any allegedly wrongful conduct that occurred before May 5, 2007, by failing to submit controlling questions to the jury and by failing to obtain material findings that the Kamats violated the FLSA before that date. In their second issue, they argue that the doctrine of equitable estoppel does not apply to Prakash's claims, and that in any event, the evidence is legally and factually insufficient to support the jury's finding that the doctrine prevents the application of the statute of limitations to her claims. They assert in their third issue that the evidence is legally and factually insufficient to support the jury's finding that they acted willfully. In their fourth issue, they argue that reversal and remand is proper because the charge question pertaining to equitable estoppel was defectively submitted and its submission was harmful. Finally, they contend in their fifth issue that the judgment violates the one-satisfaction rule and constitutes a double recovery.

In her cross-appeal, Prakash asserts that she is entitled to recover attorney's fees for trial and appellate proceedings, and she asks that we either enter an appropriate award or remand the case for the trial court to hold a hearing to

---

[3] This statute provides, "Any employer who violates the [FLSA's minimum-wage or maximum-hours provisions] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages."

determine and award an appropriate amount. Prakash also presents two "conditional" issues to be reached only if we reduce or vacate the trial court's judgment. In those issues, she asserts that the trial court erred in refusing to (a) disqualify the law firm of Rusty Hardin & Associates, P.C. from representing the Kamats; and (b) strike the Kamats' affirmative defense that Prakash's FLSA claim is time-barred.

### III. ANALYSIS

We do not address the Kamats' issues in the order presented in their brief. We generally address first those points that, if sustained, would require us to reverse and render judgment rather than to reverse and remand. *See* TEX. R. APP. P. 43.3 (when reversing a judgment, the appellate court must render judgment unless a remand is required).

**A.    The evidence is legally and factually sufficient to support the jury's finding that equitable estoppel prevents the statute of limitations from barring Prakash's claims.[4]**

When analyzing a challenge to the legal sufficiency of the evidence, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827 (Tex. 2005). We will sustain a legal-sufficiency challenge only when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital

---

[4] In this section, we address the Kamats' second issue.

fact.  *Id.* at 810.  We cannot substitute our judgment for that of the trier of fact if the evidence falls within this zone of reasonable disagreement.  *Id.* at 822.  If the evidence viewed in this light would enable reasonable and fair-minded people to find the challenged fact, then the evidence is legally sufficient.  *See id.* at 823, 827. "We will uphold the jury's finding if more than a scintilla of competent evidence supports it."  *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009).

When analyzing a factual-sufficiency challenge, we must consider and weigh all the evidence.  *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761–62 (Tex. 2003).  We will set aside a verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and manifestly unjust.  *Id.* at 761.  The jury as the trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony.  *City of Keller*, 168 S.W.3d at 819.  Thus, we may not substitute our own judgment for that of the factfinder, even if we would reach a different answer on the evidence.  *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998). The amount of evidence necessary to affirm the factfinder's judgment is far less than that necessary to reverse its judgment.  *Jones v. Smith*, 291 S.W.3d 549, 555 (Tex. App.—Houston [14th Dist.] 2009, no pet.).

### 1.     *The Equitable-Estoppel Finding*

On appeal, it was not clear from the parties' briefing whether they contended that we should measure the sufficiency of the evidence against the common-law doctrines of equitable tolling or equitable estoppel, and whether the interpretation of those doctrines by federal courts or state courts applied.  At trial, the Kamats argued that state common law governed this issue, but on appeal, they cite to both state and federal cases as binding precedent.  Prakash, on the other hand, argues on

11

appeal that precedent from the federal Fifth Circuit Court of Appeals is controlling. Both at trial and on appeal, the parties usually used the terms "equitable tolling" and "equitable estoppel" interchangeably, but in some of the Kamats' appellate no-evidence arguments, they attempt for the first time to impose distinctions sometimes drawn in federal cases between equitable estoppel and equitable tolling. *See Rhodes v. Guiberson Oil Tools Div.*, 927 F.2d 876, 878 (5th Cir. 1991) ("'Equitable tolling focuses on the plaintiff's excusable ignorance of the employer's discriminatory act. Equitable estoppel, in contrast, examines the defendant's conduct and the extent to which the plaintiff has been induced to refrain from exercising his rights.'" (quoting *Felty v. Graves–Humphreys, Co.*, 785 F.2d 516, 519 (4th Cir. 1986))).[5]

It is unnecessary for us to determine which of these possible approaches might otherwise apply, because we know the single theory that actually was submitted to the jury. In the absence of a timely and appropriate charge objection that is reurged on appeal, we measure the sufficiency of the evidence by the charge as given to the jury. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2003). Here, the jury was charged only on equitable estoppel, and the question followed the pattern-jury charge presenting the elements of that doctrine as interpreted under Texas law. The Kamats did not object to the trial court's failure to submit a question concerning equitable tolling or to instruct the jury on the elements of equitable tolling or equitable estoppel as developed in the federal common law.[6]

---

[5] This is just one such formulation from among the federal cases cited by the Kamats. There is no single uniform formulation of the elements of equitable estoppel or equitable tolling among federal courts.

[6] These are distinct inquiries. *See Holland v. Florida*, 560 U.S. 631, 130 S. Ct. 2549, 2560, 177 L. Ed. 2d 130 (2010) ("[A] nonjurisdictional federal statute of limitations is normally subject to a 'rebuttable presumption' in *favor* 'of equitable tolling.'" (quoting *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 95–96, 111 S. Ct. 453, 112 L. Ed. 2d 435 (1990))); *id.*, 560 U.S. 631, 130 S. Ct. at 2563, 177 L. Ed. 2d 130 ("Equitable tolling . . . asks whether federal courts

12

Of the objections that the Kamats have urged or reurged on appeal, the only one that they raised before the case was submitted to the jury is their no-evidence objection. We therefore measure the sufficiency of the evidence under the Texas doctrine of equitable estoppel, because this was the only theory that the jury was asked to consider as a basis for disregarding the limitations statutes. We have considered the federal authorities cited by the parties because there is some overlap between the factors necessary to establish equitable estoppel under state law and those relevant in federal equitable-estoppel or equitable-tolling cases, and we may borrow from well-reasoned and persuasive federal cases when helpful to do so. *See Davenport v. Garcia*, 834 S.W.2d 4, 20 (Tex. 1992) (orig. proceeding). Those cases, however, are not binding on this court.

Under Texas law, the doctrine of equitable estoppel is available when a person with actual or constructive knowledge of material facts makes a false representation or concealment of those facts to a party without knowledge or the means of obtaining knowledge of the facts, intending that party to act upon it, and that party detrimentally relies on the representation or concealment. *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 515–16 (Tex. 1998) (sub. op.). This is the standard incorporated in the instructions to the equitable-estoppel question submitted to the jury here. That question and its accompanying instructions were as follows:

> Question 3A
>
> Does the doctrine of equitable estoppel prevent the application of the statute of limitations for Plaintiff's claim under the Fair Labor Standards Act?
>
> > The doctrine of equitable estoppel will prevent the

---

may excuse a petitioner's failure to comply with *federal* timing rules, an inquiry that does not implicate a state court's interpretation of state law.").

application of the statute of limitations if the Plaintiff proves by a preponderance of the evidence that all the following circumstances occurred.

1.  Defendants by words or conduct made a false representation or concealed material facts, with knowledge of the facts or information that would lead a reasonable person to discover the facts, and with the intention that Plaintiff would rely on the false representation or concealment in acting or deciding not to assert her wage rights, and,

2.  Plaintiff did not know and had no reasonable means of knowing the real facts and relied to her detriment on the false representation or concealment of material facts in acting or deciding not to assert her wage rights.

ANSWER:  <u>Yes.</u>

Thus, the first paragraph of the instruction focuses primarily on the Kamats' knowledge and conduct, and the second paragraph concerns that of Prakash. For clarity, we will consider the sufficiency of the evidence of each side's knowledge and conduct separately.

## 2.  *The Kamats' Conduct*

The Kamats contend that the doctrine of equitable estoppel cannot apply to them because they testified that they were unaware that the minimum-wage law existed. Ashish, however, testified, "I know what minimum wage is." This is evidence that he knew that the minimum wage law existed. There is no evidence to the contrary.

The Kamats also argue that the evidence is insufficient to support the jury's equitable-estoppel finding because they testified they did not know that the minimum-wage statute applied to Prakash, apparently because they did not believe

14

they were Prakash's employer.[7] They instead considered her to be employed by Aparna's mother. Ashish testified, "If [Prakash] had come to me and told me that she wanted X amount of money and if I was employing her, that would be an agreement she and I would make. But that conversation never happened between the two of us." He also stated, "If [Prakash] were hired by us and had a contract with us under U.S. law, now I know that yes, . . . we would have been bound by minimum[-]wage rules."

But there is such evidence in the record. Aparna's mother Vendana Walvekar testified that Prakash "was working for my daughter and for me." She also agreed that Prakash was to be paid "not a fair wage in India but a fair wage in the United States," and that the room and board provided to Prakash by the Kamats "was part of her compensation package." Ashish testified that Prakash was performing services for the Kamats; that they benefitted from her labor; and that she performed that work in the United States. And although her wages ultimately were paid to Prakash's husband rather than to her, she testified that even under the initial agreement with Walvekar, Aparna was supposed to pay Prakash.

The evidence that the Kamats were Prakash's employer—and that they knew this—is even clearer for the time after Prakash's initial six months' employment. Although Aparna testified that Walvekar was Prakash's employer, Prakash stated that after Walvekar brought her to this country, Walvekar said she would have no further responsibility to Prakash, and said that the Kamats "are the people who are going to take care of you and they are responsible for you everything [sic]." In a deposition, Ashish was asked if Prakash ever stopped being Walvekar's employee. He answered, "I do believe that after she stayed her X number of months she

---

[7] The Kamats nevertheless do not dispute that as a matter of federal law, they were Prakash's employer. *See* 29 U.S.C. § 203(d) (2012) (defining "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee").

15

wasn't really being employed by my wife's mother although my mother-in-law and then my parents were the ones who were paying her; *so she was providing service to us after that*." (emphasis added). Aparna testified that she could "[n]ot entirely" disagree with that statement. Prakash also negotiated the duration of her employment directly with the Kamats. Moreover, both Ashish and Aparna testified that after Prakash arrived in the United States for the initial six-months' employment period, she negotiated her wages directly with them, not with their families. As Aparna stated, "[Prakash] would come and tell us that, you know, I want to be paid so much," and the Kamats are the ones who informed her whether the requested wage increase was granted. This evidence shows that even under the criteria that Ashish applied in identifying the parties to Prakash's employment agreement—and thus, in determining whether the minimum-wage law applied to her—they actually knew that Prakash was their employee.

In addition, there is evidence that the Kamats paid every other person who worked at their home an amount that, when computed on an hourly basis, equalled or exceeded the minimum wage. This is true even of Prakash's immediate replacement, who—like Prakash—was hired in India through Aparna's mother. Unlike Prakash, however, Prakash's replacement was paid $600 or $625 per month, and received her pay in dollars in the United States. Aparna testified that they pay their children's current caregiver $80 per day for approximately five or six hours of work. The Kamats' only explanation for the discrepancy in the wages paid to Prakash and those paid to their other household workers was that each worker agreed to the amounts paid. *But see Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 602–03, 64 S. Ct. 698, 88 L. Ed. 949 (1944) (explaining that no "custom or contract" to pay a person covered by the FLSA an amount less than the minimum wage can be used to deprive the person of

16

those statutory wage rights), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, ch. 52, 61 Stat. 84 (codified as amended at 29 U.S.C. §§ 251–262 (2012)).

The Kamats also contend that the evidence does not support the equitable-estoppel finding because Prakash testified that the Kamats never mentioned the minimum wage, but she did not contend that they made any affirmative representations about it. But equitable estoppel need not be based on an affirmative statement; it also can be based on concealment. As previously discussed, the evidence was sufficient to allow the jury to conclude that Ashish knew about the minimum wage; knew it would apply if the Kamats employed Prakash; and knew that they actually were Prakash's employer. In addition, Ashish testified that he did not expect Prakash to know that they could not make a private agreement to pay her less than minimum wage. They failed to inform Prakash of any of these material facts, and instead, engaged in conduct that the jury reasonably could conclude was intended to conceal the true employment relationship and their resulting obligation to pay her the minimum wage. For example, Prakash testified that even though the parties had agreed that Aparna would pay her, her wages were paid *by* someone else, *to* someone else, and in another country. Ashish additionally drafted letters to immigration authorities characterizing Prakash as a tourist rather than an employee, and referring to the lodging that he would provide as support rather than compensation.

Viewed in the light most favorable to the jury's finding, the evidence supports an inference that the Kamats were aware of their duty as Prakash's employer to pay her not less than the minimum wage, and failed to inform her of her wage rights, intending that Prakash, reasonably relying on their silence, would fail to assert her rights to higher wages year after year. Viewing the record in a

17

neutral light, the same evidence is factually sufficient to support such an inference.

### 3. *Prakash's Conduct*

The record also is legally and factually sufficient to support the implicit finding that Prakash did not know and lacked "reasonable means of knowing the real facts," and that she relied to her detriment on the Kamats' silence. Such evidence includes the following:

- Prakash was in a foreign country without her family.
- The Kamats retained possession of her passport.
- The Kamats represented to Prakash that they would bring her family to the United States.
- Before she left the Kamats' house, Prakash had no formal education.
- Prakash could neither read nor write.
- Prakash could speak Hindi, Marathi, and Konkani, but she spoke only rudimentary English.
- Prakash did not have friends of her own here, but instead was surrounded by the friends and employees of the Kamats.
- Prakash was afraid of Ashish Kamat, who struck his wife, yelled at Prakash, and even broke Prakash's glasses.
- Prakash's wages were paid to someone else in another country.
- Her initial employment offer was made and accepted in India, where there is no minimum wage.
- Ashish Kamat testified that he did not expect Prakash to know that an employer cannot make a private agreement to pay someone less than the minimum wage.
- The Kamats are American and extremely well-educated; thus, Prakash could reasonably infer that they had superior knowledge of this country's law governing their conduct. Nevertheless, both Kamats professed to be unaware that the federal minimum-wage law applied to Prakash.
- There is no evidence that anyone other than the Kamats had a duty to tell her that she had a legal right to be paid the federal minimum wage.

- Prakash could reasonably fear that if she attempted to obtain assistance from the neighbors, they would simply tell the Kamats. For example, when the Kamats' neighbor, attorney John Eikenburg, was asked at trial what he would have done if Prakash told him "that the Kamats were keeping her, basically, prisoner where she wasn't free to go," he answered that his "reaction would have, simply, been *to have told the Kamats* that they have an unhappy employee taking care of their children." (emphasis added).

- Although Prakash's former employer Ramchandani helped her when they saw each other again in December 2007, there is no evidence that at any time during her employment, anyone volunteered the information that she had a federal right to be paid the minimum wage for every hour she worked. For example, the Kamats' housekeeper testified that Prakash told her that she worked seven days a week from 6:00 am until midnight and even asked the housekeeper about "the work situation in the United States." The housekeeper agreed that those hours were excessive, but when asked if she thought to do anything about it, she said, "No, because I didn't know what her history was because she was always talking about Indian stuff so I really couldn't intervene in that; and so she lived there, I mean." The housekeeper also said she never mentioned the possibility that Prakash could work someplace else or spoke to her about work permits.

- Even if Prakash knew what questions to ask and directly sought such information, there is no evidence that she knew of someone who could have told her about her right to be paid minimum wage and was willing to do so. For example, neighbor Melissa Carroll testified, "I would feel it was inappropriate if somebody asked me about salary and wages. I would, actually, probably say I'm not comfortable talking about that; this is an inappropriate conversation."

Although the evidence on some of these points is conflicting, the jury is the sole judge of the witnesses' credibility and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. We may not pass on the witnesses' credibility or substitute our judgment for that of the jury, even if the evidence clearly would support a different result. *Mar. Overseas Corp.*, 971 S.W.2d at 407.[8]

---

[8] The Kamats argue that the evidence demonstrates no more than that Prakash was ignorant of the minimum-wage law. Citing two federal equitable-tolling cases, they state that ignorance of the law does not toll a statute of limitations. *See, e.g.*, *Teemac v. Henderson*, 298

We conclude that, whether viewed in the light most favorable to the verdict or viewed in a neutral light, the evidence is sufficient to support the jury's finding that the Kamats are equitably estopped from relying on the statute of limitations to bar any part of Prakash's FLSA claims. We overrule this issue.

## B. The trial court did not err in submitting a question on equitable estoppel.[9]

The Kamats contend that the trial court erred in submitting the equitable-estoppel question we have just discussed "because it improperly asked the jury a question of law." In support of that assertion, the Kamats cite *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 391 (5th Cir. 2002). What actually was stated in *Tyler* was this: "The equitable[-]estoppel inquiry involves questions of fact and law. Questions such as whether the employer misled the employee are questions of fact . . . ." Although *Tyler* concerned equitable estoppel under federal law rather than state law, this particular statement is equally applicable here, as the foregoing discussion illustrates. The equitable-estoppel question submitted to the jury presented a mixed question of law and fact, and such questions are appropriate for a jury to decide. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006); *Nat'l City Bank of Ind. v. Ortiz*, 401 S.W.3d 867, 881 n.8 (Tex. App.—

F.3d 452, 457–58 (5th Cir. 2002); *Barrow v. New Orleans S.S. Ass'n*, 932 F.2d 473, 477–78 (5th Cir. 1991). Here, however, we are reviewing the sufficiency of the evidence to support a finding of equitable estoppel under state law, not a finding of equitable tolling under federal law. In addition, *Teemac* concerned the question of whether evidence was sufficient to show that the plaintiff lacked both actual and constructive knowledge of his rights so as to invoke a mandatory tolling regulation that has no application here. *See Teemac*, 298 F.3d at 457–58 (determining that the plaintiff's claim was not tolled under 29 C.F.R. § 1614.105(a)(2)). The court in *Teemac* held that the plaintiff could not rely on the tolling regulation because, among other things, his employer addressed the relevant issue during employee orientation. *Id.* at 458. In *Barrow*, the court held that the plaintiff's illiteracy did not toll the limitations period, but there the plaintiff had actual knowledge of the adoption of the allegedly discriminatory seniority system. Here, the Kamats did not discuss the minimum wage with Prakash and there is no evidence that she had actual knowledge of her wage rights.

[9] This section addresses an argument that the Kamats made in support of their first issue.

Houston [14th Dist.] 2013, pet. denied). We overrule this portion of the issue presented.

### C. Prakash did not waive her right to recover for conduct that occurred before May 5, 2007.[10]

The Kamats additionally argue that Prakash waived her right to recover damages for any FLSA violations that occurred more than two years before she filed this suit because she did not ask the trial court to include any questions in the charge asking the jury whether the Kamats violated the FLSA before May 5, 2007.[11] The Kamats raised this issue in motions (1) to disregard jury findings and for judgment notwithstanding the verdict, (2) to modify the judgment, and (3) for new trial.

We review the denial of a motion to disregard jury findings and for judgment notwithstanding the verdict under the previously discussed legal-sufficiency standard. *Ingram v. Deere*, 288 S.W.3d 886, 893 (Tex. 2009); *Kroger Co. v. Brown*, 267 S.W.3d 320, 321 (Tex. App.—Houston [14th Dist.] 2008, no pet.). We review the trial court's denial of a motion to modify the judgment under an abuse-of-discretion standard. *Michelsen v. Jones*, No. 14-10-00823-CV, 2011 WL 2791154, at *1 (Tex. App.—Houston [14th Dist.] July 14, 2011, no pet.) (mem. op.). A trial court has "considerable discretion" to set aside a jury verdict. *In re Columbia Med. Ctr. of Las Colinas, Subsidiary, L.P.*, 290 S.W.3d 204, 211

---

[10] In this section, we address the remainder of the Kamats' first issue.

[11] At times, the Kamats have asserted that Prakash could recover no damages for violations that allegedly occurred before May 5, 2007 unless she submitted questions and obtained findings establishing not only that the Kamats violated the FLSA before that date, but also that those violations were willful. They cite no authority in support of their position that they cannot be equitably estopped from relying on a limitations defense absent a finding that they willfully violated the FLSA outside the limitations period. We therefore consider this argument waived. *See* TEX. R. APP. P. 38.1(i) (arguments in an appellant's brief must be supported with appropriate citations to the authorities and to the record).

(Tex. 2009) (orig. proceeding). Thus, we generally apply the abuse-of-discretion standard when reviewing the trial court's ruling on a motion for new trial. *Mindis Metals, Inc. v. Oilfield Motor & Control, Inc.*, 132 S.W.3d 477, 485 (Tex. App.—Houston [14th Dist.] 2004, pet. denied). If the motion for new trial is based on a challenge to the sufficiency of the evidence supporting the verdict, then we review the trial court's denial of the motion by applying the standard of review that corresponds to the sufficiency challenge. *Enright v. Goodman Distribution, Inc.*, 330 S.W.3d 392, 396 (Tex. App.—Houston [14th Dist.] 2010, no pet.).

Under the applicable standard of review, we conclude that the trial court neither erred as a matter of law nor abused its discretion in failing to grant any of the Kamats' post-verdict motions on this issue. In the first place, it was unnecessary to obtain an explicit finding from the jury that the Kamats violated the FLSA before May 5, 2007, because the uncontroverted evidence shows that from the first full month of Prakash's employment, they paid her less than the minimum wage. *See T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 223 (Tex. 1992) (explaining that matters established by uncontroverted evidence are not fact issues in dispute that must be submitted to the jury). But even if the Kamats were correct in asserting that such a finding was necessary, they failed to object to the omission; thus, an FLSA violation prior to May 5, 2007 must be deemed found if supported by factually sufficient evidence.[12] *See* TEX. R. CIV. P.

---

[12] In the only objection that the Kamats made to Questions 3A and 3B in the charge conference and reurged on appeal, they stated, "[W]e need to object that equitable[-]estoppel questions should not be submitted because they haven't been proven and established by the plaintiff. There is no evidence that they should apply." In post-verdict motions and on appeal they have repeatedly stated that Questions 3A and 3B are immaterial and not controlling.

The Texas Supreme Court previously has held that a no-evidence objection in the trial court does not preserve for appellate review the complaint that the question is immaterial or fails to submit a controlling issue. *See Davis v. Campbell*, 572 S.W.2d 660, 663 (Tex. 1978). Although the Kamats use the words "immaterial" and "not controlling," those expressions do not accurately capture their argument. The determination of whether they are equitably estopped to

22

279. For the reasons discussed below, the record supports such a finding.

### 1.     *The evidence establishes that the Kamats violated the FLSA in 2001.*

Although the Kamats do not concede that they violated the FLSA at any time, the absence of a genuine dispute about this can be demonstrated simply by applying basic math to the evidence.

First, it is undisputed that in the first six months of 2001, Prakash's husband was paid 10,000 rupees per month for her services. Second, both sides agreed that the average currency-conversion rate was 46 rupees for every dollar. Thus, Prakash was paid the equivalent of about $217.39 per month in the first half of 2001. And third, it is undisputed that the minimum wage at that time was $5.15 per hour. At that rate, Prakash would have been paid less than the minimum wage if she worked more than about eleven hours per week. But even the Kamats' own expert's calculations were based on Prakash working at least thirty hours per week. At that rate, even if Prakash had not disputed the Kamats' expert's calculations that most generously favored the defense—that is, that the Kamats were entitled to a credit of $38.63 per week for providing her with lodging and a credit of $5.00 per day for providing her meals—the jury, if asked to make such an express finding, still would have had to conclude that the Kamats violated the FLSA immediately after employing Prakash.[13]

---

rely on a statute of limitations is material, and controls the issue of whether they can be held liable for damages Prakash sustained as a result of FLSA violations that occurred outside the statute of limitations—*if* any such violations occurred. The Kamats argue that there are no findings that they violated the FLSA during the period of Prakash's employment that falls outside of the two- and three-year statutes of limitations. They similarly assert that there are no findings that Prakash was damaged by any such violations. Thus, their complaint is not so much about the questions that *were* submitted, but about the questions that they contend were *not* submitted.

[13] The lodging credit is equal to the maximum permitted by law. The Kamats' expert testified that a meal credit of $5.00 per day was reasonable because it was not known how many

The credits that the Kamats claim for meals and lodging actually exceeded the amount that Prakash was paid, but even if one were to add the value of these credits to Prakash's wages, she still would have been underpaid. To illustrate, the first full month of Prakash's employment was February 2001; we take this month as an exemplar because, conveniently, it consists of exactly four weeks. A meal credit of $5.00 per day would total $140.00.[14] A lodging credit of $38.63 per week for each of four weeks would be $194.52. If these amounts were added to Prakash's wages of $217.39, the total amount she constructively received in wages, meals, and lodging would have been $511.91. But if Prakash worked six hours a day, five days a week, for four weeks, then she was entitled to be paid $5.15 per hour for each of those 120 hours. This means that she was entitled to receive at least $618.00. Thus, even if one were to apply the jury instructions to the Kamats' expert's most generous calculations, their own evidence would establish that the Kamats underpaid Prakash and violated the FLSA in 2001.[15]

### 2. All necessary elements were included in the challenged question and its accompanying instructions.

In Question 3B, the jury was asked the following:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate Plaintiff for her damages, if any, that resulted from the conduct you found defendants did in Question 3A?

---

meals Prakash ate on a given day.

[14] In these calculations, however, we have assumed that the meal credit applied every day, whether Prakash worked or not. In the charge, however, the jury was instructed—without objection—that meal credits were not to exceed a certain percentage of the minimum wage "for one hour of work performed on that day." Thus, the jury actually would not have been permitted to apply a meal credit on a day that Prakash did not work. See Golden Eagle Archery, Inc., 116 S.W.3d at 771 (the jury's compliance with the charge instructions is presumed).

[15] Aparna actually estimated that Prakash worked an average of 6–8 hours per day, five days per week, and Ashish estimated that she worked 5–6 hours per day, five days per week. Under any of these estimations, Prakash's wages, even with credit for meals and lodging, was still less than the minimum wage.

24

The jury answered, "$95,220."

In arguing that the trial court erred in failing to disregard the answer to this question, the Kamats have not addressed the instructions that accompanied it, which included the following:

> The measure of damages is the *difference between what Plaintiff should have been paid under the Fair Labor Standards Act and the amount that she was actually paid during the time period of January 21, 2001 through May 5, 2007.*
>
> *In determining whether Defendants have paid the minimum wage*, Defendants may be entitled to a credit for the reasonable costs, as discussed in Instruction #4 above, they incurred in furnishing certain items such as meals, lodging, or other facilities if Defendants regularly provided the meals, lodging, or other facilities for the benefit of Plaintiff. . . .

(emphasis added). These instructions capture the elements of a claim for FLSA violations that occurred during the period of January 21, 2001 through May 5, 2007.

An employee who sues for unpaid minimum wages bears the burden to prove that he performed work for which he was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686–87, 66 S. Ct. 1187, 90 L. Ed. 1515 (1946), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, ch. 52, 61 Stat. 84 (codified as amended at 29 U.S.C. §§ 251–262 (2012)). Where, as here, the employer fails to keep adequate records,

> an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the

reasonableness of the inference to be drawn from the employee's evidence.

*Id.*, 328 U.S. at 687–88, 66 S. Ct. 1187, 1192, 90 L. Ed. 1515 (1946).

To answer Question 3B, jurors were required to determine whether Prakash was paid less than the minimum wage during the period of January 21, 2001 through May 5, 2007. In light of the instructions, Prakash was entitled to recover damages only if she should have been paid the minimum wage during this time but was paid a lesser amount. Because jurors found that Prakash did sustain damages, their answer encompasses a finding that, during at least a portion of this time period, Prakash performed work for the Kamats for which she was paid less than the minimum wage. Such an underpayment is, by definition, a violation of the FLSA. *See* 29 U.S.C. § 206(f) (2012). Thus, the instructions address all of the elements necessary to establish that the Kamats violated the FLSA during this time.

The instructions also address the elements necessary to establish the amount of Prakash's damages for these violations. Prakash was required to show only "the amount and extent of the work" for which she was improperly compensated. *See Anderson*, 328 U.S. at 687, 66 S. Ct. 1187, 90 L. Ed. 1515. The jury was instructed to measure Prakash's damages for these violations as the difference between what she should have been paid and what she was actually paid. To arrive at the amount that Prakash should have been paid, the jury first had to determine how much work Prakash performed during a particular time period and multiply the number of hours worked by the applicable minimum wage, reducing the total by the amount of any applicable credits for meals and lodging. To determine the extent of any underpayment, the jury had to subtract from that number the amount that Prakash was actually paid.

When the instructions accompanying Question 3B are applied, it is apparent that the question functions as a broad-form submission of both liability and damages—that is, the instructions capture all of the elements necessary to establish the Kamats' liability for FLSA violations that occurred from January 21, 2001 through May 5, 2007 and the amount of Prakash's damages from those violations. The instructions to Question 3B directed the jury to assess the damages, measured—substantially correctly—by the extent of the Kamats' FLSA violations from January 21, 2001 to May 5, 2007. The jury found that the amount Prakash should have been paid under the FLSA was $95,220 more than she was actually paid during this time. A finding that the Kamats violated the FLSA during this time period is necessarily subsumed within the jury's finding that there was a difference between what she was entitled to receive and what she was paid.[16]

In a related argument, the Kamats contend that the damage issue submitted in Question 3B should not have been predicated on the equitable-estoppel finding made in response to Question 3A. This argument was not raised until after the verdict—too late to preserve the alleged error. *See In re L.D.C.*, 400 S.W.3d 572, 574 (Tex. 2013) ("In civil cases, unobjected-to charge error is not reversible unless it is fundamental . . . ."); *Wilgus v. Bond*, 730 S.W.2d 670, 672 (Tex. 1987) (holding that failure to object resulted in waiver of the complaint that the charge "submitt[ed] damage issues which did not specifically relate the various elements of damages to the underlying theories of recovery"); *Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 368 (Tex. 1987) (same).

We overrule this issue.

_____

[16] We disagree with the Kamats' argument that the jury should have been asked to make a separate finding that the Kamats violated the FLSA during this time period. But even if Question 3B addressed damages during that period and did not address liability, the omitted elements of liability would be deemed found. The Kamats could avoid a deemed finding only by raising the issue before the charge was submitted. *See* TEX. R. CIV. P. 279. They failed to do so.

**D.      The Kamats failed to establish that the judgment violates the one-satisfaction rule or constitutes a double recovery.**[17]

The Kamats assert that the judgment violates the one-satisfaction rule or constitutes a double recovery. The question of whether a judgment represents a double recovery or violates the one-satisfaction rule presents a question of law, which we review de novo. *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75–76 (Tex. App.—San Antonio 2011, no pet.).

Here, the judgment is based on the answers to damage questions that overlap by a single day. When asked to assess damages for FLSA violations that occurred within the two-year statute of limitations, the jury was correctly instructed to include May 5, 2007. Based on its finding that the Kamats were equitably estopped from relying on the statute of limitations, the jury also was instructed to assess damages measured by the difference between the minimum wage that she should have been paid and the amount she was actually paid from the date she started working for the Kamats "through May 5, 2007." The Kamats did not object that (1) this is the incorrect measure of damages because May 5, 2007 is within the statute of limitations, or (2) the jury was already asked to assess damages for FLSA violations on that date. *Cf. Equistar Chems. L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 868 (Tex. 2007) (holding that in the absence of an objection that the charge submitted an improper measure of damages, the argument was not preserved for appeal).

Even if the argument is considered preserved, however, the record shows that the jury assessed damages during periods of months or years that included the date of May 5, 2007, but the record does not establish that any of the damages were assessed based on the number of hours that Prakash worked on the single

---

[17] In this section, we address the Kamats' fifth issue.

specific date of May 5, 2007 and the amount that she was paid for that one day's labor. There is conflicting evidence about whether Prakash would have worked on May 5, 2007. That was a Saturday, and both of the Kamats testified that Prakash did not work on weekends. Although Prakash testified that she worked eighteen hours a day, seven days a week, her expert witness Glen Rowe provided dozens of different analyses for minimum-wage calculations depending on, among other things, whether Prakash worked six or seven days per week.

Given the conflicting testimony, there is no way to know whether any of the damages assessed by the jury were based on a determination that Prakash worked and was underpaid for work performed on Saturday, May 5, 2007. Because we cannot establish that the judgment includes a double recovery or violates the one-satisfaction rule, we overrule this issue.

## E. The Kamats' argument that the equitable-estoppel question was defectively submitted was not preserved for review.[18]

The Kamats additionally contend that we should reverse the judgment and remand the case because the equitable-estoppel question—that is, Question 3A—was defective. According to the Kamats, "the question improperly instructed the jury to find the doctrine applicable if the Plaintiff did not know of the facts underlying her cause of action, when the doctrine presupposes that the Plaintiff did know." They also argue that Prakash was required to show that they misrepresented or concealed facts about the statute of limitations, not simply that they misrepresented or concealed facts that would show that she had a cause of action.[19]

---

[18] This was the Kamats' fourth issue.

[19] We express no opinion about the Kamats' assertion that the equitable-estoppel doctrine presupposes that Prakash knew of the facts underlying her cause of action. We note, however, that their characterization is factually incorrect: the instruction does not specify whether "the

Because this complaint was not raised in the trial court by a charge objection, it is waived. *See* TEX. R. CIV. P. 274 ("A party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection."). We overrule this issue.

## F. We do not reach the Kamats' challenge to the jury's "willfulness" finding or Prakash's two conditional cross-issues.

Having overruled the Kamats' challenges to the findings on which the trial court rendered judgment, it is unnecessary to address the Kamats' challenge to the jury's finding that their conduct was willful.[20] Because that finding was made in connection with an alternative theory of recovery on which the judgment was not based, we would have reached that issue only if we sustained one of the challenges to the findings on which the judgment against the Kamats was based.

In Prakash's cross-appeal, she raised three issues, two of which were to be addressed only if we reduced or vacated the trial court's judgment. Because we have not done so, we do not reach those issues.

## G. Prakash expressly waived her statutory right to attorney's fees.

In the sole issue remaining for our review, Prakash asks us to hold that she is entitled to attorney's fees and to either modify the judgment to award an amount that we consider appropriate or to remand the case for the trial court to hold an evidentiary hearing and determine the amount to award. We conclude, however, that she expressly waived the right to attorney's fees.

In her appellate arguments, Prakash does no more than point out that under the FLSA, a plaintiff who prevails in a claim for unpaid minimum wages has a

---

real facts" that were the subject of the Kamats' false representations or concealment or about which Prakash lacked knowledge were required to be facts about the statute of limitations or about the existence of a cause of action.

[20] This challenge was presented in the Kamats' third issue.

federal statutory right to attorney's fees. *See* 29 U.S.C.A. § 216(b). But a party may waive statutory and even constitutional rights. *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 112 (Tex. 2010). Prakash neither disputes that federal rights can be waived nor attempts to distinguish the statutory right to attorney's fees under the FLSA from any other waivable right.

Waiver occurs when a party voluntarily relinquishes a known right. *Jim Rutherford Invs., Inc. v. Terramar Beach Cmty. Ass'n*, 25 S.W.3d 845, 851 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). Prakash indisputably knew of the right to attorney's fees under the FLSA, because she cited the statute in her pleadings when requesting such an award. Despite that initial request, the record is replete with Prakash's admissions that she later voluntarily relinquished her right to attorney's fees. In a request she styled as a motion to enter judgment upon the verdict, she recited that "at trial, the Plaintiff announced that she would not seek attorney fees . . . ." In the same document, she admitted that "the Plaintiff declined to press her attorney[-]fee claim at trial . . . ." On appeal, Prakash acknowledged that the trial court denied her post-verdict request for attorney's fees precisely "because [she] had announced previously that she would not seek them." Finally, she effectively admits that her decision to forego attorney's fees was voluntary, stating that "Prakash's election not to seek fees was a strategic decision—reached, in part, to avoid allowing the contingent nature of her contract with her lawyers from becoming a distraction in the [j]ury trial, fodder for her opponents." These admissions establish that she knowingly and voluntarily waived the statutory right to attorney's fees.

We accordingly overrule this issue.

## IV. CONCLUSION

Having overruled each of the issues that were preserved for our review and necessary to the disposition of the case, we affirm the trial court's judgment.


/s/    Tracy Christopher
Justice


Panel consists of Justices Boyce, Christopher, and Donovan.