Ramona G. ESCALANTE, and
Margarito P. Escalante,
Appellants,

v.

James D. KOERNER, D.O., Center for
Genetic Services, Shawn Marie Strain,
M.D., P.A., and Raymond Lewandow-
ski, Jr., M.D., P.A., Appellees.

No. 13–97–910–CV.

Court of Appeals of Texas,
Corpus Christi.

Aug. 10, 2000.

Craig S. Smith, Donald B. Edwards, Smith & Edwards, Corpus Christi, for appellants.

James Kevin Oncken, Uzick & Oncken, P.C., San Antonio, Matthew T. McCracken, John C. Marshall, Marshall & McCracken, P.C., Houston, Thomas F. Nye, Linda C. Breck, Brin & Brin, Richard C. Woolsey, Carlos Villarreal, Barger, Hermansen, McKibben & Villarreal, Corpus Christi, Steven M. Gonzalez, Marshall & Gonzalez, McAllen, for appellees.

Before Justices HINOJOSA, YAÑEZ, and RODRIGUEZ.

## OPINION

Opinion by Justice YAÑEZ.

This appeal involves claims of medical negligence, gross negligence, and intentional infliction of emotional distress [1] arising from the demise of one fetus in a twin pregnancy and the handling of the remains of that fetus. The trial court granted a directed verdict in favor of all defendants on all claims. We affirm the trial court's judgment with respect to the negligence claims, and also affirm the trial court's judgment that appellant Margarito Escalante take nothing on his claim for intentional infliction of emotional distress. However, we reverse and remand the claim of appellant Ramona Escalante for intentional infliction of emotional distress against appellee Dr. James D. Koerner.

1. The Escalantes also pleaded a cause of action for fraud. However, they have asserted no argument on appeal in support of their fraud cause of action. Therefore, we do not consider the fraud cause of action to be before us, and the trial court's judgment with respect to that cause of action remains in force.

In late 1993 appellant Ramona Escalante became pregnant with twins. Her obstetrician/gynecologist was Dr. Koerner. On December 27, 1993 Escalante had a sonogram and the fetal heart rate of Twin B at that time was 163, within normal range. Because Ramona would be thirty-five years old when the twins were due, Dr. Koerner recommended that Ramona also undergo amniocentesis. The amniocentesis was performed by appellee Dr. Shawn Strain on January 20, 1994, when Ramona was approximately eighteen weeks pregnant. During the amniocentesis Twin B was observed as having a very low heart rate. The next day Twin B's heart had stopped altogether.

Thereafter Dr. Koerner advised Ramona and her husband Margarito that Twin B was "reabsorbing" and that there was nothing left of Twin B. Ramona had several sonograms after the demise of Twin B, and she asked to see Twin B on the sonogram monitor. However, Ramona testified that the monitor would be turned so she could not see it, and Dr. Koerner would tell her that she "didn't need to see a baby that was in pieces." Despite Dr. Koerner's assurances that there would be nothing left of Twin B when Twin A was born, the Escalantes contacted a funeral home to arrange for a burial of Twin B and had a small coffin made.

In June 1994 Ramona entered a hospital for Twin A to be delivered by caesarian section. The Escalantes took with them the small coffin they had for Twin B in anticipation of receiving the remains of Twin B. Before the surgery Ramona was asked to sign a consent form that authorized the doctor and hospital to "dispose of, in accordance with the accustomed practice, any tissue or body parts surgically removed." Ramona testified that she reiterated her desire to receive whatever remained of Twin B, and Dr. Koerner told

her that the form referred only to the afterbirth. With that understanding, she signed the consent form. While Twin A was being delivered Ramona again asked Dr. Koerner if anything was left of Twin B. Ramona testified that Dr. Koerner told her "there is nothing left. Concentrate on your little boy."

Dr. Koerner testified that neither of the Escalantes ever communicated to him a desire to receive the remains of Twin B. He testified that Ramona's testimony about the sonogram monitor being turned away from her view was false. He also testified that a nurse secured Ramona's signature on the consent form authorizing "dispos[al] of, in accordance with the accustomed practice, any tissue or body parts surgically removed," and that he was not even present in the room at that time.

In March 1996 the Escalantes learned that Twin B had not been wholly reabsorbed, and that photos[2] existed of Twin B. The remains of Twin B, rather than being delivered to the Escalantes, were disposed of as surgical waste. Ramona testified that, after learning that there had been some remains of Twin B despite Dr. Koerner's statements to the contrary, she "was feeling lied to. I was feeling—I became sick, and I was having migraines, and I was just crying, very upset."

## Medical Negligence

■ Appellants first complain of the trial court's decision to refuse to allow their medical expert to testify regarding the cause of Twin B's demise, and the subsequent directed verdict on their claims for medical negligence. Had appellants' expert been allowed to testify about causation, they contend, a fact issue would have been present for the jury to resolve regarding whether the medical negligence of appellees caused the demise of Twin B. However, we hold that, because appellants

---

**2.** The photos show a fetus that is approximately five inches in length, with clearly distinguishable arms, legs, neck and head, as well as faint indications of facial features.

There was no expert testimony regarding the extent to which this fetus had actually been "reabsorbed."

are not entitled to recover the sort of mental anguish they suffered under a medical negligence theory, the trial court acted properly in directing a verdict against them on their medical negligence claims and the exclusion of their medical expert was of no consequence.

■ A directed verdict is proper where the record contains evidence establishing the movant's position as a matter of law. *Rivera v. Herndon Marine Prods., Inc.,* 895 S.W.2d 430, 432 (Tex.App.—Corpus Christi 1995, writ denied). On appeal, we consider all of the evidence in the light most favorable to the parties against whom the verdict was directed. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex.1983). If the record contains more than a scintilla of evidence on any theory of recovery, a directed verdict is improper, and we must reverse and remand for the jury's determination on the issue. *Rivera,* 895 S.W.2d at 432.

■ When a woman contends that medical negligence caused the loss of her fetus, she may only recover mental anguish damages to the extent her anguish arises from the loss of the fetus "as part of her own body." *Edinburg Hosp. v. Trevino,* 941 S.W.2d 76, 79 (Tex.1997). She may not recover for grief "felt over the loss of the fetus as a separate individual." *Id.*

In *Edinburg Hospital,* the Texas Supreme Court summarized the evidence of the plaintiff's mental anguish this way:

Mora sought to prove mental anguish damages in part by presenting evidence that she had made preparations in expectation of the arrival of her baby: she had set aside a room in her home for the baby and purchased furniture for the room. She also testified that the loss of the fetus "still hurts [her] like it was yesterday," that she carries a clipping of the funeral service with her, and that her marriage deteriorated after the loss of the fetus.

*Id.*

The Texas Supreme Court concluded that "this evidence relates to the grief that Mora felt over the loss of the fetus as a separate individual and not as part of her own body." *Id.* Therefore, the Texas Supreme Court held she was not entitled to compensation based on the evidence presented. *Id.*

The evidence of mental anguish in this case is indistinguishable from the evidence presented in *Edinburg Hospital.* Ramona repeatedly expressed her desire to receive Twin B's remains and began arrangements for a burial. When Twin A was delivered and Dr. Koerner told her there were no remains of Twin B, Ramona testified that she was "very upset because I wanted anything that had been left to take home to bury." She referred to Twin B in her testimony as a "baby," which also indicates her focus on Twin B "as a separate life."

Only once did Ramona offer testimony that might be interpreted as connecting her mental anguish to grief over the loss of "a part of her body." Ramona testified

I was very sad and upset, and just couldn't hold my little boy [the surviving twin] because I felt something was missing. And I became very depressed. I became very ill. I just felt like I just—I just couldn't go on. *I just felt like a part of me was missing* and I just didn't know how to deal with it. (emphasis added).

It is apparent from the context of this statement and Ramona's other testimony that her statement about "missing a part of her" referred to the longing she felt for Twin B as a separate life to which she felt a close, emotional connection, and not literally as a part of her body.

In addition to seeking recovery for mental anguish, appellants also sought compensation for physical pain, loss of earning capacity, disfigurement, physical impairment, medical expenses, and loss of consortium. However, close examination of the evidence presented reveals that each of these non-mental anguish types of damages actually result from appellants' men-

tal anguish. For example, Ramona testified that her emotional pain made her physically ill and required her to seek psychiatric care. Therefore, because the mental anguish suffered by appellants arose from their grief over "the loss of the fetus as a separate individual," and not from the loss of the fetus "as a part of [Ramona's] body," they are not entitled to compensation for their mental anguish or for any of the other alleged damages that derive from their mental anguish.

We hold that, under *Edinburg Hospital*, appellants are not entitled to recover for their mental anguish and other damages deriving from that mental anguish arising from the alleged medical negligence of the appellees.

## Intentional Infliction of Emotional Distress

■ However, we hold that Ramona may be entitled to recover on her cause of action for intentional infliction of emotional distress brought against Dr. Koerner. The tort of "intentional" infliction of emotional distress may also be supported by evidence that the defendant acted recklessly, that is, when the defendant "knows or has reason to know of facts which create a high degree of risk of … harm to another, and deliberately proceeds to act, in conscious disregard of, or indifference to that risk." *Twyman v. Twyman*, 855 S.W.2d 619, 624 (Tex.1993). In addition to showing that the defendant acted intentionally or recklessly, the plaintiff must establish that the defendant's conduct was extreme and outrageous, the plaintiff suffered severe emotional distress, and that the plaintiff's severe emotional distress was caused by the defendant's actions. *Id.* at 621.

■ "Severe emotional distress" means distress so severe that no reasonable person could be expected to endure it without undergoing unreasonable suffering. *Benavides v. Moore*, 848 S.W.2d 190, 195 (Tex.App.—Corpus Christi 1992, writ denied). Any party seeking recovery for

mental anguish, even when advancing a cause of action that does not require the "severe" damages required for intentional infliction of emotional distress, must prove more than "mere worry, anxiety, vexation, embarrassment, or anger." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).

Ramona testified that, when she learned that there had been remains of Twin B and she had not been permitted to have a burial for those remains as she had requested, she "broke down for about three hours. I just couldn't get up. I couldn't believe it." She further testified that she was "in shock" and her emotional distress caused her to vomit. She had persistent migraine headaches and "wouldn't get out of bed." She testified at the trial, held three years after the healthy twin was born, that her emotional distress "continues till this day. I feel like I was—I just didn't have anything to bury. I felt like part of my life was not over…. I just became very depressed."

Her husband, Margarito Escalante, reiterated Ramona's testimony that they had repeatedly informed Dr. Koerner of their desire to receive the remains of Twin B, but that Dr. Koerner always told them that Twin B would be reabsorbed prior to the birth of the surviving twin. He described the scene when Ramona underwent her caesarian section this way:

> He said, "Ramona, there's—there's nothing left. There's nothing left of your baby." We just look[ed] at each other, and I show[ed] him the box, [I said] "But we want something. I mean, even if it's in a jar, it's in a plastic bag, whatever." He said, "Ramona, there's nothing." She was crying. She was crying. She wanted something.

Margarito testified that "it hurt" when he saw the pictures of Twin B. He offered this description of their mental anguish:

> All these years, it's been hard. Because we wanted something. We wanted to bury at least, like, I told you, a piece,

maybe of tissue, whatever, whatever was left, just go bury it, and, you know, go over there later on and go—go see her, cry, and put some flowers, something to remind us there was something there.

▆▆▆ Appellees point to evidence that Ramona was referred by her doctor for a CT scan to explore possible physical, non-psychological causes for her migraine headaches, and that she failed to have the scan done. However, even removing Ramona's migraine headaches from consideration, the other evidence is sufficient to establish her severe emotional distress. However, Margarito's testimony that "it hurt" and had "been hard" fails to clear the very high hurdle of severe emotional distress. Therefore, the trial court acted properly in directing the verdict against Margarito on his claim for intentional infliction of emotional distress.

▆▆▆ We continue to examine the remaining elements of this tort to assess the directed verdict against Ramona. Next, we consider whether Dr. Koerner's actions were "extreme and outrageous," and whether this conduct caused appellants' severe emotional distress. "Extreme and outrageous conduct" means conduct which is "atrocious, and utterly intolerable in a civilized community." *Twyman*, 855 S.W.2d at 621. Before a question is submitted to a jury on intentional infliction of emotional distress, the court must determine, as a question of law, whether the plaintiff has presented evidence which, if believed, meets this standard for "extreme and outrageous" conduct. *Wornick Co. v. Casas*, 856 S.W.2d 732, 734 (Tex.1993).

▆▆▆ As fact-finder, the jury may believe or disbelieve any or all of the testimony of any witness. *Barnes v. State Bar of Tex.*, 888 S.W.2d 102, 110 (Tex.App.-Corpus Christi 1994, no writ). If the fact-finder chose to believe the testimony of the Escalantes and disbelieve that of Dr. Koerner, then the evidence would be that the Escalantes repeatedly asked for the remains of Twin B. Dr. Koerner lied to them and told them Twin B was reabsorbed. He prevented Ramona from viewing sonogram images that might have betrayed his lies. He told the Escalantes that the phrase "tissue or body parts surgically removed" in the hospital consent form did not apply to Twin B's remains, when he actually intended that Twin B's remains *would* be disposed of as mere "tissue or body parts surgically removed." He then secretly permitted the disposal of the remains of Twin B as surgical waste, despite knowing that it was very important to the Escalantes that they be able to bury the remains as they would a dead child. We conclude that, were the jury to resolve the conflicts in the parties' testimony this way, Dr. Koerner's behavior would meet the "extreme and outrageous" standard.

▆▆▆ Next, we consider whether the Escalantes' severe emotional distress was caused by Dr. Koerner's actions with regard to the remains of Twin B. Obviously, the Escalantes were upset not only about being unable to bury Twin B's remains, but also that Twin B did not survive. However, almost two years passed between the delivery of Twin B's remains and the Escalantes' learning that Twin B had not been reabsorbed but had instead been disposed of as surgical waste. This second blow had a distinct effect on Ramona. She testified that when she heard that there had been remains of Twin B, but those remains were disposed of as surgical waste, she "broke down for three hours," vomited, and "couldn't get up." We hold that Ramona presented more than a scintilla of evidence that Dr. Koerner's handling of her requests for the remains of Twin B caused her severe emotional distress.

▆▆▆ Finally, we consider whether there was more than a scintilla of evidence that Dr. Koerner acted intentionally or recklessly. Viewed in the light most favorable to appellants, Dr. Koerner knew or had reason to know of facts which created a high degree of risk of harm, yet deliber-

ately proceeded to act, in conscious disregard of, or indifference to, that risk. The Escalantes testified that they repeatedly told Dr. Koerner that they wanted the remains of Twin B. They told him this during the pregnancy, before the caesarian section, and during the caesarian section. They brought the small coffin for Twin B to the hospital and left it in plain view of Dr. Koerner while he tended to Ramona. The Escalantes' testimony shows overwhelmingly that Dr. Koerner knew that burying Twin B's remains was very important to the Escalantes, yet he misled them regarding the status of Twin B's remains and ultimately disregarded their desires.

■ Dr. Koerner argues that the Escalantes waived their right to recover for the handling of Twin B's remains when they signed the consent form authorizing the doctor and hospital to "dispose of, in accordance with the accustomed practice, any tissue or body parts surgically removed." Dr. Koerner argues that this language unambiguously waived any right the Escalantes may have had to complain about the handling of Twin B's remains. We disagree.

■ First, we do not agree that the phrase is unambiguous. Were the remains of Twin B "tissue or body parts surgically removed?" What is "accustomed practice" for disposing of such items? One might expect the "accustomed practice" would be to consult the patient. Obviously, these provisions were ambiguous. If a written instrument is ambiguous, the trier of fact may look to parol evidence in construing the instrument. *Lenape Resources Corp. v. Tennessee Gas Pipeline Co.*, 925 S.W.2d 565, 574 (Tex.1996). In this case, Ramona testified that she asked Dr. Koerner whether the phrase in question applied to the remains of Twin B, and he assured her that it did not.

Secondly, the written form itself anticipates a need for hospital personnel to explain the form to the patient. Under the language of the form, the patient must "certify that this form has been explained to me." Dr. Koerner's explanation of the phrase in question was that it did not apply to the remains of Twin B. Where a hospital and its physicians have drafted a form which requires patients to certify that the form has been "explained" to them, those explanations are incorporated into the agreement and the hospital and its physicians are bound by them.

If the factfinder chooses to believe Ramona's testimony regarding Dr. Koerner's explanation of the form and chooses to disbelieve Dr. Koerner's denials, then a question of fact exists regarding whether Ramona waived her right to complain about the handling of the remains of Twin B by signing the release. We hold that appellees have failed to establish as a matter of law that Ramona waived her right to complain about the handling of the remains of Twin B by signing the release.

Nor does the Texas Supreme Court's opinion in *Edinburg Hospital v. Trevino* preclude Ramona from recovering on a claim for intentional infliction of emotional distress arising from Dr. Koerner's responses to the Escalantes' requests for the remains of Twin B. *Edinburg Hospital* held that the Texas wrongful death statute did not provide standing for parents to sue as the survivors of a demised fetus. *Edinburg Hosp.*, 941 S.W.2d at 79. Furthermore, the hospital owed no duty to a fetus that was never born alive. *Id.* Finally, the mother could not sue as a "bystander" to her own personal injuries. *Id.* None of these barriers are present for Ramona's claim for intentional infliction of emotional distress. Ramona is a living adult, suing for her own injury in the form of emotional distress, alleging tortious conduct directed at her.

We hold that the trial court erred in directing a verdict against Ramona on her claim for intentional infliction of emotional distress against Dr. Koerner arising from his responses to the Escalantes' requests for the remains of Twin B.

## Conclusion

We affirm the trial court's judgment directing a verdict that the Escalantes take nothing on all claims against Dr. Shawn Marie Strain, Dr. Raymond Lewandowski, and against the Center for Genetic Services, and on all claims against Dr. James Koerner except for Ramona's claim against Dr. Koerner for intentional infliction of emotional distress. We reverse the trial court's judgment on Ramona's claim against Dr. Koerner for intentional infliction of emotional distress arising from his responses to the Escalantes' requests for the remains of Twin B, and remand this case to the trial court for further proceedings on that cause of action only.