**Motion for Rehearing Denied; Majority Opinion of July 6, 2023, Withdrawn and Judgment Vacated; Reversed and Rendered in Part, Affirmed as Modified in Part, and Substitute Majority Opinion and Dissenting Opinion on Rehearing filed November 21, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00433-CV

---

## BILL WYLY DEVELOPMENT, INC. AND WILLIAM WYLY, Appellants

## V.

## ERON SMITH AND HANNA SMITH, Appellees

---

**On Appeal from the 212th District Court**
**Galveston County, Texas**
**Trial Court Cause No. 14CV1126-A**

---

## S U B S T I T U T E   M A J O R I T Y   O P I N I O N

We deny appellees' motion for rehearing.[1]  We withdraw our majority opinion of July 6, 2023, vacate our previous judgment, and issue the following substitute majority opinion.  Appellees' motion for reconsideration en banc is denied as moot.

---

[1] Justice Spain would grant the appellees' motion for rehearing.

Appellants Bill Wyly Development, Inc. ("Wyly Development") and William Wyly ("Wyly") appeal an adverse judgment on claims of trespass and intentional infliction of emotional distress. Appellees Eron and Hanna Smith claimed that Wyly threatened to ruin their lives and damaged their Tiki Island property after the Smiths declined to hire Wyly Development to build a house on the property. A jury found appellants liable, and the trial court signed a judgment awarding the Smiths $32,500 plus interest and costs.

Appellants assert two issues. First, appellants contend that the trial court erred by denying their motion for directed verdict on the intentional infliction of emotional distress claim because there is no evidence (a) that Wyly engaged in extreme and outrageous conduct, and (b) that the Smiths suffered severe emotional distress as a result. We sustain this issue because we conclude that Wyly's complained-of conduct was not extreme and outrageous, as Texas courts understand and have construed those terms. We render judgment that the Smiths take nothing on their intentional infliction of emotional distress claim.

In their second issue, appellants urge that the trial court erroneously denied their motion for new trial because the evidence is factually insufficient to support the jury's award for trespass damages. We overrule this issue because the damage award is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust.

Accordingly, we reverse and render in part, and affirm as modified in part.

## Background

The Smiths and Wyly met in 2013 when the Smiths were looking to purchase a lot on Tiki Island. The Smiths found a lot they liked and followed directions on a yard sign to Wyly's office. Wyly explained that the lot was owned by another person

and that his company had built homes on other lots in the area. The Smiths purchased the lot from a third party.

The Smiths met with Wyly several times to discuss using his company to build their home, but they ultimately decided not to go forward with Wyly Development. They informed Wyly of their decision in June 2014. Two or three days later, while the Smiths sat in their pickup truck near the lot, Wyly approached them. Wyly launched into a profanity-laced diatribe, threatening to "ruin their lives" and do everything he could to make them miserable and prevent them from developing their lot. During the incident, Wyly reached his finger inside the Smiths' pickup and pointed at Hanna. This confrontation lasted at most five minutes, after which Eron drove away. The Smiths did not describe any further confrontations between themselves and Wyly.

The Smiths felt threatened by Wyly's words and behavior. Hanna believed that Wyly's extreme anger made him unpredictable and potentially dangerous. She testified that the episode affected her sleep, and she was unable to live her life normally for some period. Eron was prescribed anxiety medication after this incident. The Smiths had dreamed about building in the Galveston area for quite some time, but they abandoned plans to build on their lot because Wyly planned to build his own house nearby.

The Smiths' lot apparently remained vacant for the next three years. During that time, concrete, paint cans, excavated dirt, and other "construction trash" appeared on the lot. According to the Smiths, Wyly told them that his subcontractors dumped the debris there. Wyly did not deny that his subcontractors may have been responsible for the dirt and some damage to the Smiths' lot. Further, Wyly acknowledged that his swimming pool subcontractor dumped "lots" of excavated

3

dirt on the Smiths' property at his direction. In 2017, the Smiths paid $11,500 to have the trash and debris removed and to have their lot leveled.

Wyly Development sued the Smiths for breach of contract and fraud because they declined to hire the company to build their house. The Smiths filed an answer and counterclaims and named Wyly as a third-party defendant. Defensively, the Smiths asserted that Wyly Development's breach-of-contract claimed failed under the statute of frauds. Additionally, the Smiths asserted affirmative claims for trespass and intentional infliction of emotional distress against both Wyly Development and Wyly. The breach-of-contract claim proceeded to a bench trial, which resulted in a take-nothing judgment against Wyly Development. The trial court severed all other claims by agreement. The court of appeals affirmed the judgment against Wyly Development on its breach-of-contract claim. *See Bill Wyly Dev., Inc. v. Smith*, No. 01-16-00296-CV, 2017 WL 3483225, at *1 (Tex. App.—Houston [1st Dist.] Aug. 15, 2017, no pet.) (mem. op.).

In the meantime, the Smiths' trespass and intentional infliction of emotional distress claims proceeded to a jury trial. At the close of evidence, appellants' trial counsel moved for a directed verdict on the Smiths' intentional infliction claim. The trial court denied the motion. The jury found that appellants trespassed on the Smiths' property and awarded $11,500 in damages. The jury further found that appellants intentionally inflicted emotional distress. For that claim, the jury awarded the Smiths $20,000 for past mental anguish and $1,000 for future mental anguish. Finally, the jury found by clear and convincing evidence that both the trespass and intentional infliction claims were committed with malice, though the jury was not asked to award exemplary damages.

Appellants filed a motion to disregard the jury's intentional infliction of emotional distress findings, arguing among other things that Wyly's conduct in

4

confronting the Smiths was not sufficiently extreme and outrageous to justify recovery. No written ruling denying the motion appears in our record, but the court later signed a final judgment incorporating the jury's findings and awarding the Smiths $32,500 in damages, plus pre- and post-judgment interest.[2] Appellants also filed a motion for new trial, reasserting a no-evidence challenge to the intentional infliction of emotional distress findings and further contending that the jury's damage award for the trespass claim was not supported by factually sufficient evidence. This motion was overruled by operation of law. Tex. R. Civ. P. 329b(c).

Appellants timely appealed.[3]

## Intentional Infliction of Emotional Distress

In their first issue, appellants contend that the trial court erred by denying their motion for directed verdict on the Smiths' intentional infliction of emotional distress claim because there is no legally sufficient evidence that Wyly's conduct was extreme and outrageous.[4]

---

[2] Nothing in our record reflects the disposition of Wyly Development's fraud claims. This does not create a judgment finality concern, however, because a judgment rendered after a conventional trial on the merits is presumed to be final and appealable, and this judgment states as much. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 199 (Tex. 2001).

[3] According to appellants, William Wyly died after the trial court rendered judgment. In such circumstances, we proceed to adjudicate the appeal as if all parties were alive. Tex. R. App. P. 7.1.

[4] Appellants both (1) moved for a directed verdict at the close of evidence and (2) filed a motion to disregard the jury's findings. Therefore, appellants preserved error on their legal sufficiency challenge. *See* Tex. R. App. P. 33.1(a), (b); *Daniels v. Empty Eye, Inc.*, 368 S.W.3d 743, 748-49 (Tex. App.—Houston [14th Dist.] 2012, pet. denied). Citing Texas Rule of Appellant Procedure 38.1(i), our dissenting colleague contends that we have no basis to decide whether the judgment against Wyly Development on the intentional infliction claim is improper because Wyly Development has not argued on appeal that the trial court erred in rendering judgment on the intentional infliction claim and has therefore waived any argument in that respect. In their motion for rehearing, the Smiths adopt the dissenting justice's argument. We reject their assertion, however, because appellants' brief, filed jointly by Wyly and Wyly Development, challenges the trial court's denial of their motion for directed verdict and argues that there is legally insufficient

5

## A. Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the evidence, we consider the proof in the light most favorable to the finding, crediting evidence in its favor if a reasonable fact finder could and disregarding contrary evidence unless a reasonable fact finder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The proof is legally insufficient if: there is no proof of a vital fact; rules of law or evidence bar the court from giving any weight to the only proof of a vital fact; the proof supporting a vital fact is no more than a scintilla of evidence; or the proof conclusively shows the opposite of a vital fact to be true. *See Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015).

## B. Applicable Law

To prevail on a claim for intentional infliction of emotional distress, the Smiths had to prove by a preponderance of the evidence that: (1) Wyly acted intentionally or recklessly; (2) his conduct was extreme and outrageous; (3) his actions caused the Smiths emotional distress; and (4) the emotional distress was severe. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 796 (Tex. 2006) (citing *Hoffmann-LaRoche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004), and *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 740 (Tex. 2003)); *Dworschak v. Transocean Offshore Deepwater Drilling, Inc.*, 352 S.W.3d 191, 197 (Tex. App.—Houston [14th Dist.] 2011, no pet.). Appellants challenge the evidence supporting the second and fourth elements. We address only the second element because we conclude appellants' argument on that element is dispositive. Tex. R. App. P. 47.1.

---

evidence to support the Smiths' intentional infliction claim. Moreover, in the prayer for relief, both Wyly Development and Wyly ask that we reverse and render judgment in their favor for the reasons expressed in the brief, including because the intentional infliction finding lacks legally sufficient evidentiary support. Thus, we conclude that Wyly Development sufficiently raised, and did not waive, a challenge to the legal sufficiency of the evidence to support this claim.

To meet the second element, a defendant's conduct must be "'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993) (quoting Restatement (Second) of Torts § 46 (1965)). "Meritorious claims for intentional infliction of emotional distress are relatively rare precisely because most human conduct, even that which causes injury to others, cannot be fairly characterized as extreme and outrageous." *Suberu*, 216 S.W.3d at 796 (citing *Creditwatch, Inc. v. Jackson*, 157 S.W.3d 814, 815 n.1 (Tex. 2005)). Recovery for intentional infliction of emotional distress must typically be based on circumstances that border on "serious criminal acts." *Creditwatch, Inc.*, 157 S.W.3d at 818. Generally, insensitive or rude behavior does not constitute extreme or outrageous conduct. *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 611-12 (Tex. 1999). Likewise, liability does not arise from mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id.* at 612.

It is for the court to decide in the first instance whether a defendant's conduct was extreme and outrageous. *Zeltwanger*, 144 S.W.3d at 445 (citing *Bruce*, 998 S.W.2d at 612). However, if reasonable minds may differ, it is for the jury—subject to the court's control—to determine whether the particular conduct was sufficiently extreme and outrageous to result in liability. *Id.*

The severity and duration of the challenged conduct are central considerations. Generally, only actions of particular severity and of repeated or continued duration will enter the realm of extreme and outrageous conduct. *See Bruce*, 998 S.W.2d at 617. Although malicious and abusive incidents should not be condoned, when they occur only briefly or occasionally, recovery is unavailable under an intentional infliction of emotional distress claim. *See id.* We examine the

context and relationship between the parties when considering whether certain conduct qualifies as extreme and outrageous. *Id.* at 612. And when repeated or ongoing severe harassment is shown, we evaluate the conduct as a whole in determining whether it is extreme and outrageous. *Id.* at 616.

## C.    Application

Shortly after the Smiths informed Wyly that they had decided not to use Wyly's company, Wyly confronted the Smiths while they were in their vehicle near the lot. Eron described the confrontation as follows:

> Mr. Wyly pulls up, goes past us. It's a cul-de-sac. We're sitting here, our lot's kind of on our right, we're a little past it. I see a vehicle go by and do a turn, and comes up and pulls out. And lo and behold, Mr. Wyly and he comes out and begins his assault on -- his promising to ruin our lives, to do everything he can to make our lives miserable and on and on and on with cuss words and profanity. . . . Because he attacked verbally, in a lot of ways. It was the hardest thing -- one of the hardest things I've ever done, not getting out of that truck. We sat there and we listened to him. . . . And even went to the extent to reach his finger in and point at my wife, I guess, to give us some of more pointers that I will not repeat. And -- unless someone asks me specifically if they want to hear the words and the verbiage that he used and his threats. It affected us and ruined our dream of working since third grade to get to this. And he decided -- I'm offended, my feelings are hurt, I have no contract, I haven't provided mechanical/electrical plans, I've never hired an architect, the plans that I gave you were not scaled, and we never agreed to anything, but you have to let me build your house and if you don't I'm going to cuss you out and promise to ruin your lives. . . .
>
> He -- his explanation of how he was going to ruin -- and it wasn't my life, it was our lives -- was basically, I will sabotage and do everything I can to keep you from living on this lot, developing this lot, and I'll -- I've been here. I know all the inspectors. I know -- and these were with profanity mixed in, every other word -- through how he would do -- he was going to spend the rest of his days making our life miserable and

8

even blocking us, in the United States of America, from building a home on property we owned.

Eron was fearful of what Wyly might do. He "didn't know if [Wyly] was armed" and "didn't know what [Wyly's] mental capacity was." Eron testified that he reported the incident to the local police, but he did not say whether the police took any action.

Hanna testified that she felt personally threatened by Wyly during the confrontation. She testified that Wyly followed her and Eron to their lot after they told him they did not want to hire his company to build their home. She stated she was very disturbed by the confrontation and that it was "months" before she returned to visit the lot. Hanna also stated that Wyly's behavior afterwards, such as having subcontractors dump materials and trash on their lot, reinforced to her the threat Wyly presented. Based on Wyly's behavior, she and Eron decided that they "were not building anything on the lot."

For his part, Wyly agreed that he "verbally abused, intimidated, and bullied" the Smiths after they decided not to use his company to build on their lot. He admitted that he was "furious" and "cussing" during the confrontation. He also acknowledged that he was angry enough to have engaged in "a physical altercation," but Eron "wouldn't get out of his truck."

Turning to appellants' argument, we are aided by several cases discussing whether conduct was sufficiently extreme and outrageous to warrant recovery. In one case, *Tiller v. McClure*, 121 S.W.3d 709 (Tex. 2003), Tiller and McClure had a dispute about McClure's completion of a construction project. Over a period of four months, Tiller called McClure at home about the project approximately sixty times. Many of the calls occurred during non-business hours, including late in the evenings, over holidays, and on the weekend. During the calls, Tiller expressed dissatisfaction

9

with the project's progress, repeatedly threatened to terminate the contract, and was "consistently rude, demanding, and curt." *Id.* at 712. Tiller even threatened to cancel the contract if the construction site was closed for the day of McClure's husband's funeral. *Id.* at 713-14. The court noted, however, that Tiller never "directly attacked" McClure or used "vulgar or obscene" language. *Id.* Tiller's calls required McClure to make approximately twenty-five unnecessary trips to the construction site. *Id.* The supreme court held that Tiller's conduct was not extreme and outrageous, reasoning that while "regularly insensitive, unreasonable, or otherwise wrongful," his course of conduct in that commercial contract dispute "was not severe enough." *Id.* at 715.

Other courts have determined that verbal abuse and threats were insufficient to support liability. In *Saucedo v. Rheem Manufacturing Co.*, 974 S.W.2d 117, 123-24 (Tex. App.—San Antonio 1998, pet. denied), Saucedo asserted an intentional infliction of emotional distress claim against his employer and a co-worker, Loera. Saucedo presented summary-judgment evidence that, over a three-year period, Loera repeatedly humiliated him with obscene language, insulted him, threatened to have him fired, and frequently called or paged him unnecessarily late at night.[5] The court of appeals affirmed summary judgment against Saucedo, holding that Loera's actions, though insensitive, rude, and repetitive, did not constitute extreme and outrageous conduct. *See id.* at 124. Likewise, in reversing a plaintiff's jury verdict,

---

[5] Saucedo presented evidence that Loera frequently used the word "fuck" while insulting him, including phrases like "You don't know what the fuck you're doing"; "You are all fucked up"; "I am going to fucking fire you"; and "Saucedo, once again you missed the fucking boat." *Id.* at 123. On another occasion, Loera verbally insulted Saucedo in front of an environmental official, saying: "I don't want any excuses. You were supposed to get this done and you did not get it accomplished"; "You're always looking for fucking excuses. You've always got an excuse for everything. I don't want to hear your fucking excuses anymore." *Id.* Saucedo testified that Loera would lose Saucedo's requisitions for critical parts and then insult him when a machine broke down by saying, "It's all your fucking fault." *Id.*

10

the court in *Union Pacific Railroad Co. v. Loa*, 153 S.W.3d 162, 164 (Tex. App.—El Paso 2004, no pet.), held comparable vulgar and obscene, even racist, insults were not sufficiently extreme and outrageous to support recovery for intentional infliction of emotional distress.[6] The same court reversed another jury verdict for intentional infliction of emotional distress when representatives of the defendant treated the plaintiff "rudely, insensitively, verbally threatened him, and, as alleged by [the plaintiff], defamed his reputation." *Richard Rosen, Inc. v. Mendivil*, 225 S.W.3d 181, 184-85 (Tex. App.—El Paso 2005, no pet.). This conduct, which occurred over a period of several months, did not rise to the level of outrageousness necessary to recover for intentional infliction of emotional distress. *Id*. at 194.

In comparison, we note decisions concluding that the defendant engaged in extreme and outrageous conduct, or at least that a fact question existed on the issue. The supreme court reversed a summary judgment for the defendant in *Morgan v. Anthony*, 27 S.W.3d 928, 930-31 (Tex. 2000). There, the defendant had stopped to offer assistance to the plaintiff, who experienced car trouble when driving home. During the encounter, the defendant made several sexually suggestive comments, including that her husband was not "taking care of [her] in the car department" and in other areas of her life. *Id.* at 930. He said that he could help her in that area, told her he did not live far away, and suggested that she follow him so that he could fix her car and provide "anything extra" that she needed, all the while leaning into her car with one hand on the dashboard and staring at her breasts and between her legs. *Id.* When the plaintiff eventually managed to shut and lock her car door, he stood outside the window and said things like, "come on baby, open the door." The

---

[6] In *Loa*, the evidence showed that a supervisor verbally abused and harassed the plaintiff weekly over a one-year period. *Id.* at 165. The supervisor's "hostile and rude" behavior included screaming, yelling, and cursing, as well as making extremely racist remarks against those of Mexican heritage, and threatening to have the plaintiff and others fired. *Id.*

plaintiff was able to restart her car and drive away, but not faster than about five miles per hour. The defendant pursued and passed her, pulling onto the shoulder in front of her. Her vehicle stalled again, and the defendant came over and began pulling at her door, knocking at her window, and telling her she needed him. *Id.* Though she managed to restart her car again and drive away, the defendant continued to pursue and harass her even after she repeatedly requested that he leave her alone and told him he was scaring her. The plaintiff ultimately managed to get away by pulling into a diner parking lot and calling her father for help. *Id.* at 930-31. After detailing the defendant's actions, the supreme court "had no difficulty" in concluding that there was evidence that the defendant engaged in extreme and outrageous conduct. *Id.* at 931.

In another employment case, the supreme court held that the defendant's conduct was extreme and outrageous when he, over a period of two years, "engaged in a pattern of grossly abusive, threatening, and degrading conduct," including "repeatedly physically and verbally threaten[ing] and terroriz[ing]" employees. *Bruce*, 998 S.W.2d at 613-14.[7] In *Escalante v. Koerner*, 28 S.W.3d 641, 643 (Tex. App.—Corpus Christi 2000, pet. denied), the court of appeals reversed a directed verdict rendered in the defendant's favor. There, Escalante gave birth by caesarian section to one healthy twin. The other twin had died in utero and Koerner, her

---

[7] In *Bruce*, the plaintiffs, three female employees, alleged that their supervisor, Morris Shields, "constantly harassed and intimidated them" in a "vulgar dictatorial manner." *Id.* at 608. They produced evidence that, over a period of more than two years, Shields regularly used harsh vulgarity and "abusive profanity" when speaking to them, despite their frequent requests that he stop. *Id.* at 613. The employees testified that Shields repeatedly physically and verbally threatened and terrorized them. They provided evidence that Shields "was continuously in a rage" and he "frequently assault[ed] each of the employees by physically charging at them." *Id.* at 613-14. Further, he regularly threatened to fire the employees and engaged in other abusive acts. The supreme court described the workplace he created as a "den of terror for the employees" and explained that it was "the severity and regularity of Shields's abusive and threatening conduct that [brought] his behavior into the realm of extreme and outrageous conduct." *Id.* at 614, 617.

doctor, told Escalante the fetus had been "reabsorbed" and therefore there was nothing left to bury. *Id.* at 644. Escalante later learned that the remains had been disposed of as surgical waste despite Koerner's knowledge that Escalante and her husband wanted to bury the remains. *Id.* The court determined that the trial court erred in finding the doctor's conduct was not extreme and outrageous as a matter of law. *Id.* at 647-48. In *Mayhew v. Dealey*, 143 S.W.3d 356 (Tex. App.—Dallas 2004, no pet.), the Dallas Court of Appeals affirmed a jury finding of intentional infliction of emotional distress in a wrongful death case. The jury found the defendant, Charles Mayhew Jr., liable for causing his father's death and for intentional infliction of emotional distress. *Id.* at 359. The evidence showed that Charles Jr. had "verbally abused his father, and he threatened to kill and mutilate him," using extremely vulgar and profane language. *Id.* at 360. Further, Charles Jr. "forced [his father] into bed, pulled the sheets taut, and held the muzzle of the shotgun only two to three feet from Charlie's face before firing." *Id.* The court explained that "[t]his terrifying sequence of events most certainly was so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Id.* (internal quotation omitted).

Based on the above authority, we conclude that Wyly's conduct as described by the Smiths was not sufficiently severe or of such a duration as to support an affirmative finding of extreme and outrageous conduct. Wyly's verbal confrontation with the Smiths clearly included insults, indignities, and threats, but these are not sufficient. Moreover, according to the Smiths, the single encounter lasted at most five minutes. Courts have rejected liability even when relatively comparable insults and harassment persisted for months or years. *See Tiller*, 121 S.W.3d at 712-15; *Loa*, 153 S.W.3d at 164-65; *Saucedo*, 974 S.W.2d at 123-24. We also note the absence of any relevant relationship between Wyly and the Smiths that would have

made it easier for Wyly to have subjected the Smiths to ongoing harassment. They were not related by blood or marriage; they were not parties to a contract; and they were not in an employment relationship or co-workers. In contrast to *Morgan*, Eron, sitting in the driver's seat of his car with the engine running, could have ended the encounter by driving away at any time. Had Wyly's verbally abusive attacks continued repeatedly for a substantial time period, in the context of a relationship or circumstances the Smiths could not easily or conveniently terminate, then today's outcome might be different. But on the evidence presented, Wyly's behavior simply does not rise to the level found to be sufficient in cases like *Morgan*, *Bruce*, *Koerner*, and *Mayhew*. Although Wyly "was callous, meddlesome, mean-spirited, officious, overbearing, and vindictive," his actions were not "'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'"[8] For these reasons, we conclude that Wyly's conduct and statements to the Smiths during the verbal confrontation cannot support recovery for intentional infliction of emotional distress.

In addition to the confrontation described above, the Smiths rely on other facts that they say support the jury's finding of extreme and outrageous conduct. Specifically, they point to (1) appellants' initial filing of the lawsuit against them and (2) the "trashing" of their lot.[9] But these are examples of events that cannot

---

[8] *Jackson*, 157 S.W.3d at 817-18 (quoting *Zeltwanger*, 144 S.W.3d at 445); *see also Canchola*, 121 S.W.3d at 737 (reversing intentional infliction of emotional distress claim for "failing to meet the exacting requirements of that tort"); *Tiller*, 121 S.W.3d at 715; *Tex. Farm Bureau Mut. Ins. Cos. v. Sears*, 84 S.W.3d 604, 606 (Tex. 2002); *Bradford v. Vento*, 48 S.W.3d 749, 751-52 (Tex. 2001); *City of Midland v. O'Bryant*, 18 S.W.3d 209, 211 (Tex. 2000); *Brewerton v. Dalrymple*, 997 S.W.2d 212, 213-14 (Tex. 1999); *Standard Fruit & Vegetable Co. v. Johnson*, 985 S.W.2d 62, 63 (Tex. 1998); *Sw. Bell Mobile Sys., Inc. v. Franco*, 971 S.W.2d 52, 53 (Tex. 1998); *Loa*, 153 S.W.3d at 171-72; *Mendivil*, 225 S.W.3d at 195.

[9] During opening argument, the Smiths' counsel argued:

support a claim for intentional infliction of emotional distress because other legal remedies exist for the purported wrongs.

In recognizing the "gap-filler" tort of intentional infliction of emotional distress, the Supreme Court of Texas "never intended that it be used to evade legislatively imposed limitations on statutory claims or to supplant existing common law remedies." *Zeltwanger*, 144 S.W.3d at 447. The tort is intended for the limited purpose of allowing recovery in rare instances when "a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Id.*; *see also Waffle House, Inc. v. Willliams*, 313 S.W.3d 796, 808 (Tex. 2010). When the gravamen of a plaintiff's complaint is really another tort, an intentional infliction of emotional distress claim should not be available. *Zeltwanger*, 144 S.W.3d at 447-48; *see also Garcia v. Shell Oil Co.*, 355 S.W.3d 768, 775-76 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("This is true even if the plaintiff does not assert the precluding claim in her petition . . . or asserts the displacing claim but does not prevail . . . .").

To the extent the Smiths believed Wyly Development's filing of a breach-of-contract and fraud lawsuit was wrongful or frivolous, they could have sued for malicious prosecution or sought sanctions—claims and remedies they have not pursued. Further, damages for "trashing" the lot are recoverable under a trespass

---

[The Smiths] wouldn't have ever filed a lawsuit against Mr. Wyly, even though they were offended, deeply offended and frightened by what he would do – by what he was threatening to do until Mr. Wyly started carrying out his threats. Mr. Wyly directed his people to go out on their property, trespass on their property, damage their property, trash they property. And then Mr. Wyly filed a lawsuit against Eron and Hanna for breach of contract and fraud for not going with him as the builder for over a $100,000.

And Eron testified that he sued Wyly "because of his threats to my family and my life," but he also acknowledged that he and Hanna would not have asserted their counterclaims if Wyly had not sued them first.

claim, which the Smiths asserted and for which they recovered damages. Today we affirm the judgment for trespass damages, as explained below. Accordingly, the additional conduct upon which the Smiths rely cannot support recovery under an intentional infliction of emotional distress claim. *E.g.*, *Williams*, 313 S.W.3d at 808; *Zeltwanger*, 144 S.W.3d at 447; *Johnson*, 985 S.W.2d at 65-68; *Kaplowitz v. Lone Star Tan GP, LLC*, No. 14-20-00329-CV, 2021 WL 6199627, at *7 (Tex. App.—Houston [14th Dist.] Oct. 19, 2021, no pet.) (mem. op.).

For these reasons, we hold that the trial court erred by denying appellants' motion for directed verdict on the Smiths' intentional infliction of emotional distress claim. We sustain appellants' first issue.

## Trespass Damages

In their second issue, appellants contend that the trial court erred by denying their motion for new trial because the evidence is factually insufficient to support the jury's damage award for trespass.

### A. Factual Sufficiency Standard of Review

When a party challenges the factual sufficiency of the evidence supporting a finding for which it did not have the burden of proof, we may set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998); *Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 769 (Tex. App.—Houston [14th Dist.] 2004, no pet.). In performing our review, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged findings. *See Ellis*, 971 S.W.2d at 406-07; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). If we determine the evidence is factually insufficient, we must detail the evidence relevant to the issue and state in what regard the contrary evidence greatly outweighs

16

the evidence in support of the verdict; we need not do so when affirming the judgment. *Gonzalez v. McAllen Med. Ctr., Inc.*, 195 S.W.3d 680, 681 (Tex. 2006) (per curiam).

This court is not a fact finder. *Ellis*, 971 S.W.2d at 407. Instead, the trier of fact is the sole judge of the credibility of the witnesses and the weight to afford their testimony. *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615-16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). Therefore, we may not pass upon the witnesses' credibility or substitute our judgment for that of the trial court, even if the evidence would also support a different result. *Id.*

**B.    Application**

The jury charge defined "trespass" as: "an entry on or use of the property without having consent or authorization of the owner. To constitute trespass, entry or use of another's property need not be in person but may be made by causing or permitting anything to cross the boundary of the property." The jury was instructed to consider the following element of damage: "The reasonable cost in Galveston County, Texas to repair, fix or restore the property to the condition it was in immediately preceding the injury." In the absence of a timely and appropriate charge objection that is re-urged on appeal, we measure the sufficiency of the evidence by the charge as given. *Kamat v. Prakash*, 420 S.W.3d 890, 899 (Tex. App.—Houston [14th Dist.] 2014, no pet.) (citing *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 530 (Tex. 2003)).

Appellants contend that the only acts of trespass established by the evidence were those that Wyly admitted to, such as placing dirt on the lot and causing ruts from a trailer's tire. According to appellants, the damage award improperly includes compensation for some trespasses that could not be attributable to Wyly.

17

Wyly admitted dumping dirt on the lot and causing ruts with a trailer. The trial court also admitted into evidence an invoice provided by the Smiths for clearing and leveling the lot. This invoice stated:

> Clear vacant lot located at 1626 Windsong in Tiki Island, Texas.
>
> Removed massive amounts of construction debris that was dumped at the site. This included concrete, concrete washout from cement trucks, lumber, trash, rebar, old broken form materials and riprap. We used a breaker hammer to break out the concrete that was too large to load and haul off. We removed all debris, disposed of all debris and graded the lot to a level surface.
>
> The price includes the following:
>
> - Bobcat and breaker hammer rental.
> - Delivery fee and pick up.
> - Dump truck and driver.
> - Dump fees.
> - Site grading.
> - Site leveling.
> - Superintendent's fee.

The total due reflected on the invoice was $11,500.00. Eron testified without objection that he was familiar with "the type of work necessary to do the work that was done by" on the property. He described himself as an expert in the field, again without objection. And he opined that the amount charged in the invoice was "a fair and reasonable amount" to perform this work. He also testified that he had paid the invoice.

Eron stated that Wyly told him that Wyly's subcontractors were responsible for the trash and damage to the Smiths' lot:

> Q. Right. So go through there -- and the jury will have to figure out what Mr. Wyly did or didn't do on that long list of things that are on that invoice; right? A lot of stuff on that invoice that -- you know, you have testified Mr. Wyly did those things.

18

A. Well, all I can tell you is, like I said earlier under testimony, that I didn't live out there. I don't have cameras out there. *I was told by Mr. Wyly that his subcontractors did that.*

Q. All of the things on that invoice?

A. When I asked him about where all this trash came from, *he said my subcontractors. So I'm assuming what was hauled off, listed on the invoice wasn't made up, it was there and had to be removed. . . .*

Q. Okay. All the stuff on that invoice, paint cans, the concrete?

A. Yes, sir.

Q. Washout?

Q. Yes, sir.

Q. *Mr. Wyly told you his subcontractors were responsible for all that?*

A. *Yes, sir. . . .*

Q. *And you think Mr. Wyly owned up to putting all that on your property or having his subcontractor do it?*

A. *Yes, sir. . . .*

Q. *Throughout that whole three years, just kept dumping on your property?*

A. *Yes, sir.*

(Emphases added).

Although Wyly denied telling Eron that his subcontractors dumped trash and other debris on the Smiths' lot, the jury was entitled to believe Eron's testimony, which was admitted without objection, and to reject Wyly's contrary evidence. *Pascouet*, 61 S.W.3d at 615-16. We may not pass upon the witnesses' credibility or substitute our judgment for that of the trial court, even if the evidence would also support a different result. *Id.* Eron's testimony and the invoice detailing the work done to level and clear the Smiths' lot support the jury's damages award. Further, Wyly acknowledged on cross-examination that he told Eron that people working for him caused damage to the Smiths' property. Wyly also testified that "someone in [his] group" ran over the Smiths' "no trespassing" sign and caused ruts on the

19

property and that one of his subcontractors caused damage to the lot. He also testified that, at his direction, a swimming pool contractor placed excavated dirt on the Smiths' lot. The above evidence constitutes some evidence that the debris the Smiths paid to have removed from their lot was put there by Wyly or at his direction. Any evidence tending to support a contrary finding is slight at best.

Considering all the evidence in a neutral light, we cannot say that the jury's award of $11,500 for trespass damages is so weak or so contrary to the overwhelming weight of all the evidence as to make the award unjust or excessive. *See Ellis*, 971 S.W.2d at 406. We overrule appellants' second issue.

## Conclusion

We have determined that the trial court erred in denying appellants' motion for directed verdict on the Smiths' intentional infliction of emotional distress claim. Accordingly, we render judgment that the Smiths take nothing on that claim. However, we have overruled appellants' factual sufficiency challenge to the jury's trespass damages award, and we affirm the judgment as modified.


/s/    Kevin Jewell
         Justice



Panel consists of Chief Justice Christopher and Justices Jewell and Spain (Spain, J., concurring in part and dissenting in part).

20